**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CONFERENCE OF PRESIDENTS OF MAJOR ITALIAN AMERICAN ORGANIZATIONS, INC.** | : : : : | Case No. 2:21-cv-01609 |
| and | : : | |
| **PHILADELPHIA CITY COUNCILMEMBER MARK F. SQUILLA** | : : : | **DEMAND FOR JURY TRIAL** |
| and | : : | |
| **THE 1492 SOCIETY** | : : | |
| and | : : | |
| **JODY DELLA BARBA** | : : | |
| *Plaintiffs*, | : : | |
| v. | : : | |
| **CITY OF PHILADELPHIA** | : : : | |
| and | : : | |
| **MAYOR JAMES F. KENNEY** | : : | |
| *Defendants*. | : : | |

**COMPLAINT**

Plaintiffs, The Conference of Presidents of Major Italian American Organizations, Inc., Councilmember Mark F. Squilla, The 1492 Society and Jody Della Barba, by and through undersigned counsel, bring this Complaint against the City of Philadelphia and Mayor James F. Kenney and allege the following facts and claims upon personal knowledge, investigation of counsel, and information and belief.

## NATURE OF THE ACTION

1.     This lawsuit arises from the continued, unrelenting, and intentionally discriminatory acts undertaken by Mayor James F. Kenney and the City of Philadelphia against its Italian American citizens.

2.     On January 27, 2021, Mayor Kenney issued Executive Order 2-21 *canceling* Columbus Day – a historic holiday under Pennsylvania and Federal law – and replaced it with "Indigenous Peoples' Day."

3.     Mayor Kenney's order reads, in part: "The City holiday celebrated on the second Monday in October, ***formerly*** known as Columbus Day, shall now be designated as Indigenous Peoples' Day." *See* Executive Order No. 2-21, attached as **Exhibit "A."** (Emphasis added.)

4.     While both groups' ethnicity deserve recognition, Mayor Kenney may not take action that discriminates against Italian Americans to exalt another ethnic group in its place.

5.     Mayor Kenney unilaterally issued Executive Order No. 2-21 without regard for the multiple restrictions of the Philadelphia Home Rule Charter applicable to the designation of holidays, without regard to the separation of powers that it and state law provide, without regard to Pennsylvania's Sunshine Act, 65 Pa.C.S. §§ 701-716, and without regard to the Home Rule Act prohibiting the City from taking any action "contrary to" state law.

6.     Mayor Kenney made no proposal to City Council about canceling Columbus Day, nor ever sought its approval, never obtained approval from the Civil Service Commission, never provided the public with the requisite notice and opportunity to be heard, never considered (or explicitly ignored) Pennsylvania state law (which expressly designates Columbus Day as a holiday across the Commonwealth), and never engaged in activity integral to a functioning democracy.

7.      The canceling of Columbus Day is the most recent – but probably not the last – act in a long line of divisive, anti-Italian American discriminatory actions taken by Mayor Kenney during his Administration.

8.      For example, Mayor Kenney previously took unilateral actions against two iconic Italian American statues prominently displayed for decades within the City of Philadelphia: first, the removal of the Frank L. Rizzo statue (in the middle of the night) from the plaza at the Municipal Services Building and, second, the attempted removal of the 140 year-old Christopher Columbus statue from its longtime home at Marconi Plaza.

9.      No other statues in the City (amongst the many hundreds) have been targeted by the Mayor.

10.      Both attempted seizures of Italian American statues are the subject of separate lawsuits now pending against the City of Philadelphia and Mayor Kenney.

11.      By way of further recent example, Mayor Kenney blatantly discriminated against Philadelphia's First Councilmanic District (largely populated by Italian Americans) by purposely depriving them of COVID relief vaccinations when making city-wide allocations.

12.      Mayor Kenney also recently demoted Captain Louis Campione from his longtime assignment in Philadelphia's First Police District, baselessly accusing him of sanctioning "vigilantism" when South Philadelphia Italian American residents sought to protect the Columbus Statue located at Marconi Plaza from vandalism by protestors.

13.      Further still, Mayor Kenney has a long history of making public anti-Italian American comments. For instance, in a 2016 rant by Mayor Kenney about immigration and his desire for Philadelphia to remain a "Sanctuary City", he stated: "If this were Cousin Emilio or Cousin Guido, we wouldn't have this problem because they're white."

14.     Such actions collectively paint a picture of a Mayor unmistakably bent on prejudicing Italian Americans and governing the City of Philadelphia according to crude racial stereotypes and unconstitutional racial classifications.

## THE PARTIES

15.     Plaintiff, Conference of Presidents of Major Italian American Organizations, Inc. ("COPOMIAO"), is a New York non-profit corporation that has its main office at 1296 Midland Avenue, Yonkers, New York 10704. The President of The COPOMIAO is Basil M. Russo. The COPOMIAO consists of member Presidents of forty-six (46) different organizations and their individual members, among which include[1]:

1)  Italian Sons and Daughters of America; Basil M. Russo, President

2)  OSDIA-Commission for Social Justice; Robert Ferrito, President

3)  OSDIA-Sons of Italy Foundation; Comm. Joseph Sciame, President

4)  Order Sons of Italy in America; Nancy DiFiore Quinn, National President

5)  UNICO National; Frank N. DeFrank, President

6)  Italian Welfare League; Joan Prezioso, President

7)  Italian American Legal Defense Fund, Inc.; Prof. Santi Buscemi

8)  California Italian American Task Force; William Cerruti, Chairman

9)  National Italian American Bar Association; Francis M. Donnarumma, President

10) American Italian Federation of the Southeast; Charles Marsala, President

11) American Society of the Italian Legions of Merit; Gr. Uff. Rosemarie Gallina-Santangelo, President Emerita

---

[1] These Italian American organizations have a physical presence in at least the following states: Pennsylvania, New York, New Jersey, Washington, D.C., Connecticut, South Carolina, Louisiana, Delaware, Massachusetts, Nevada, California, Illinois, and Virginia. Many of these organizations are nationally or globally recognized.

12) American Italian Renaissance Foundation (American Italian Cultural Center); Frank Maselli, Chairman

13) A Chance in Life (Boys' & Girls' Towns of Italy); Gabriele Delmonaco, President/Executive Director

14) Coalition of Italo American Associations; Uff. Cavaliere Maria Fosco

15) Coccia Foundation; Elisa Coccia, President

16) The Coccia Institute for the Italian Experience in America; Mark Rotella, Director

17) Columbus Citizens Foundation; Marian U. Pardo, President

18) Columbus Heritage Coalition; Angelo Vivolo, President

19) Cooley's Anemia Foundation, Inc.; Craig Butler, Executive Director

20) Delaware Commission on Italian Heritage and Culture; Richard A. DiLiberto, Jr., Chairman

21) Garibaldi Meucci Museum; Carl Ciaccio, Chairman & Stephanie Lundegard, Administrator

22) Italian Academy Foundation, Inc.; Stefano Acunto, Chairman

23) Italian American Alliance, Inc.; Dr. Francis Mazzaglia, Chairman

24) Italian American Baseball Foundation; Joseph J. Quagliano, President

25) Italian American Club of Southern Nevada; Angelo A. Cassaro, President

26) Italian American Committee on Education; Berardo Paradiso, President

27) Italian American Democratic Leadership Council; Jim Rosapepe, Vice Chairman

28) Italian American Museum; Dr. Joseph Scelsa, President

29) Italian American Museum of Los Angeles; Marianna Gatto, Executive Director

30) Italian American One Voice; Dr. Emanuel Alfano, Chairman

31) Italian American War Veterans of the United States; Tony Ficarri, National Commander

32) Italian Heritage and Culture Committee of the Bronx and Westchester; Patricia A. Santangelo, President

33) Italian Heritage and Culture Committee of New York, Inc.; Joseph Sciame, President & Chair

34) Italian Language Foundation; Margaret I. Cuomo, M.D., President

35) Joint Civic Committee of Italian Americans; Ron Onesti, President

36) Justinian Society of Lawyers; Hon. Scannicchio, President

37) La Festa Italiana di Lackawanna County; Chris DiMattio, President

38) National Council of Columbia Associations; Pietro Segalini, Senior Vice President

39) National Columbus Education Foundation; John Viola, Executive Director

40) Filitalia International; Paula DeSanctis-Bonavitacola, President

41) National Council for the Promotion of the Italian Language in American Schools, Inc.; Dr. Daniel L. Stabile, National President

42) American Delegation of the Sacred Military Constantinian Order of Saint George; Brendan Young, Executive Director & John Viola, Delegate

43) NJ Italian Heritage Commission; Robert DiBiase, Chair & Cav. Dr. Gilda Rorro

44) The Italian Cultural Foundation at Casa-Belvedere; Gina Biancardi, President

45) Tuscan Association of New York, Inc.; Joan Marchi Migliori, President

46) UNICO Foundation; Kathleen Strozza, Representative/Trustee

16.    Plaintiff, Councilmember Mark F. Squilla, is an adult individual, Italian American, Philadelphia resident and member of Philadelphia City Council. Councilmember Squilla represents City Council's First District, and was first elected in 2011. Councilmember Squilla

maintains an office at Philadelphia City Hall, Room 332, Philadelphia, PA 19107, and brings this action in his official capacity as a Member of Philadelphia City Council and as an individual resident and taxpayer of the City of Philadelphia.

17.    Plaintiff, The 1492 Society[2] is a Pennsylvania non-profit corporation that has its main office at 1526 Wolf Street, Philadelphia, Pennsylvania 19145.

> [The 1492 Society's] purpose is to promote Italian culture and traditions by sponsoring the annual Philadelphia Columbus Day Parade and Festival through fundraising activities. . . . The 1492 Society through a broad range of philanthropic, educational & cultural activities, organizes Philadelphia's annual Columbus celebration and Columbus Day parade which celebrates Italian American heritage. [It] hold[s] a parade & festival each year. The parade & festival are open to the general public & also seeks to foster a spirit of multi-culturalism and respect for people of all ethnic backgrounds.[3]

18.    Plaintiff, Jody Della Barba, is an adult individual, Italian American and Philadelphia taxpaying resident. Jody Della Barba is the Parade Organizer and Secretary of The 1492 Society.

19.    Defendant, City of Philadelphia (the "City"), is a municipality existing under the laws of the Commonwealth of Pennsylvania, with headquarters at 1515 Arch Street, Philadelphia, Pennsylvania 19102.

20.    Defendant, Mayor James F. Kenney ("Mayor Kenney"), is the Mayor of the City of Philadelphia. He maintains an office at Philadelphia City Hall, Room 215, Philadelphia, Pennsylvania 19107.

## JURISDICTION AND VENUE

---

[2] The members of The 1492 Society are primarily Philadelphia Italian Americans. The 1492 Society hosts the annual Philadelphia Columbus Day Parade and maintains the objective of recognizing the Italian explorer, Christopher Columbus.

[3] *Nonprofit overview*, Great Nonprofits, https://greatnonprofits.org/org/1492-society.

21.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(3) in that the controversy arises under the United States Constitution and under 42 U.S.C. § 1983.

22.     Plaintiffs further invoke the supplemental jurisdiction of this Court over the pendent state law claims pursuant to 28 U.S.C. § 1367(a).

23.     All of the acts alleged herein were done by Defendants, or their officers, agents and employees, under color and pretense of the statutes, ordinances, regulations, customs and usages of the City of Philadelphia and the Office of the Mayor.

24.     This Court has personal jurisdiction over Defendants because the acts that give rise to this action all took place in Philadelphia, Pennsylvania.

25.     This Court has authority to award attorney's fees pursuant to 42 U.S.C. § 1988.

## FACTS COMMON TO ALL COUNTS

## THE HISTORY OF COLUMBUS DAY

26.     For the past two centuries, Italian immigrants and Italian Americans have embraced Christopher Columbus as a symbol of the courageous voyage their families endeavored when immigrating from Italy to the United States of America.

27.     As Italian immigrants and Italian Americans began facing widespread discrimination in the late 1800s, many rallied around Christopher Columbus as a symbol of the contributions Italians have made to this Nation and the courage they endured historically.

28.     On March 14, 1891, eleven Italian Americans were lynched in New Orleans after being falsely accused of the murder of the New Orleans police chief.[4]

---

[4] Erin Blakemore, *The Grisly Story of America's Largest Lynching*, History (Oct. 25, 2017) ("March 14, 1981 would go down in history as one of the darkest moments in the United States' long history of anti-Italian discrimination."), attached as **Exhibit "B."**

29.     Those lynched were ordinary working-class immigrants that arrived in the United States from Italy to build a better life for themselves and their families.[5]

30.     Columbus Day was recognized in part in light of the discrimination of Italian-Americans and (more broadly) Catholics.  It quickly became an annual observance and "a source of dignity and self-worth for Italian Americans."[6]

31.     As described in Charles Mires' *Encyclopedia of Philadelphia*,

> The ethnic and religious character of the holiday was clear in Philadelphia in 1892, the four-hundredth anniversary of the first Columbus voyage, which came in the midst of a surge of Italian immigration. In addition to celebrations in Italian neighborhoods, the Columbus commemoration activities that year included a torchlight parade of Catholic organizations on Broad Street, a Solemn Pontifical Mass at the Cathedral on Logan Square, and a performance by parochial schoolchildren at the Academy of Music.[7]

32.     In the 1920s and 1930s, the Ku Klux Klan attempted to destroy Columbus Day because of their bigotry toward Catholics and Italian immigrants.

33.     In an effort to dispel the pervasive discrimination against Italian Americans, Congress took action to further recognize and show appreciation for this Nation's Italians.

34.     In 1934, Congress issued a joint resolution requesting that the President issue a proclamation designating October 12 of each year as Columbus Day. H.R.J. Res. 10, 73d Cong. (1934), attached as **Exhibit "E."**

---

[5] *Id.*

[6] *NIAF Statement on Christopher Columbus & Columbus Day*, NIAF, https://www.niaf.org/culture/christopher-columbus/, attached as **Exhibit "C."**

[7] Charles Mires, *Columbus Day*, The Encyclopedia of Greater Philadelphia, https://philadelphiaencyclopedia.org/archive/columbus-day/, attached as **Exhibit "D."**

35.     In 1937, President Franklin D. Roosevelt issued a proclamation recognizing Columbus Day.

36.     Today, Christopher Columbus and Italian Americans are facing persecution throughout the country at levels not seen since the 1920s when the KKK charged Christopher Columbus with the same heinous – and *unsupported* – wrongdoings Mayor Kenney and the City of Philadelphia are making in support for their effort to cancel the Columbus Day holiday.

## CITY OF PHILADELPHIA COUNCILMEMBER MARK F. SQUILLA ENLISTED AN EXPERT TO INVESTIGATE CHRISTOPHER COLUMBUS

37.     In early 2018, City of Philadelphia Councilmember Squilla enlisted Robert F. Petrone, Esq. – a Philadelphia attorney (an Assistant District Attorney) and renowned Christopher Columbus expert – regarding the true historical record of Christopher Columbus.

38.     Mr. Petrone's credentials made him the ideal person to take on this project, as he was conversant with the relevant primary source materials that were written during and shortly after Christopher Columbus's life, was fluent in Spanish, and he was well-versed at interpreting 15th century Spanish texts.

39.     To aid Mr. Petrone in this important work, Mr. Petrone was provided with *History of the Indies*, by Bartolome de las Cases, which is one of the most important and authoritative primary sources regarding the life, trans-Atlantic expedition, and gubernatorial administration in the West Indies of Christopher Columbus, as well as a comprehensive history of the first sixty-eight years of the Spanish settlements in that region.

40.     Mr. Petrone also had access to copies of the original texts which were written in 15th and 16th century Spanish, and he verified the accuracy of the sources' translation to English.

41.     After extensive focused research and investigation, Mr. Petrone provided Philadelphia City Council with two reports detailing his findings with respect to the life and

voyages of Christopher Columbus. Both reports are attached hereto as **Exhibit "F":** A Report by Robert F. Petrone, Esquire, to City Council of the City of Philadelphia on History of the Indies Book I of VI; A Report by Robert F. Petrone, Esquire, to City Council of the City of Philadelphia on History of the Indies Books II and III (of III).

42.     Mr. Petrone's reports not only unequivocally demonstrate there is no support in the primary source materials to corroborate the heinous wrongdoings Mayor Kenney and the City of Philadelphia now falsely charge Christopher Columbus with, but also demonstrate that the primary historical sources unanimously bear out that Christopher Columbus was the first recorded civil-rights activist of the Americas, having (1) prohibited the mistreatment and the enslavement of the tribal peoples by the hidalgos (low, landed nobles of Spain) during his tenure as governor of the West Indies; (2) established the first "underground railroad" of the Americas by traveling around the West Indies on his Second Voyage rescuing Tainos from enslavement by the man-eating Carib and Canib tribes; and (3) successfully petitioned the King of Spain to promulgate the first civil rights legislation of the Americas decreeing that "all the Indians of Hispaniola were to be left free, not subject to servitude, unmolested and unharmed and allowed to live like free vassals under law just like any other vassal in the Kingdom of Castile."

43.     Mr. Petrone's research found that nowhere in any of the three volumes of *History of the Indies* is there evidence that Columbus mistreated the Indigenous People. Nor does any evidence appear in any of the primary sources.  Quite to the contrary, de las Casas's *History of the Indies* and all primary sources explicitly indicate that Christopher Columbus repeatedly protected the tribal peoples, even the cannibalistic Caribs who often attacked him and his sailors unprovoked. *Id.*

## **EXECUTIVE ORDER 2-21**

44.     Despite Philadelphia City Council having been provided with Mr. Petrone's detailed reports that conclude there is no support for the charges the City and Mayor now level against Christopher Columbus, Mayor Kenney – unilaterally – issued Executive Order 2-21 that claimed: "Columbus enslaved indigenous people, and punished individuals who failed to meet his expected service through violence and, in some cases, murder" and thereby decided to cancel Columbus Day by replacing it with Indigenous Peoples Day. *See* Executive Order No. 2-21, **Exhibit "A."**

45.     The Executive Order further reads: "[T]he story of Christopher Columbus is deeply complicated. For centuries, he has been venerated with stories of his traversing the Atlantic and 'discovering' the 'New World'. The true history of his conduct is, in fact, infamous. Mistakenly believing he had found a new route to India, Columbus enslaved indigenous people, and punished individuals who failed to meet his expected service through violence and, in some cases, murder . . . The City holiday celebrated on the second Monday in October, formerly known as Columbus Day, shall now be designated as Indigenous Peoples' Day." *Id.*

46.     In a Press Release that followed the issuance of Executive Order 2-21, the Mayor stated:

> While changes to City holidays may seem largely symbolic, we recognize that symbols carry power. We hope that for our employees and residents of color, this change is viewed as an acknowledgement of the centuries of institutional racism and marginalization that have been forced upon Black Americans, Indigenous people, and other communities of color. At the same time, we are clear-eyed about the fact that there is still an urgent need for further substantive systemic change in all areas of local government.

*See* City's Pathways to Reform, Transformation, and Reconciliation, City of Philadelphia (Feb. 3, 2021), **Exhibit "G."**

47.     Mayor Kenney and the City are thus explicitly choosing which ethnicities should be credited, supported, and approved by the City government, and which ethnicities should be shamed, disdained and canceled.  The United States Constitution forbids such governmental behavior.

48.     In issuing Executive Order No. 2-21, Mayor Kenney could have recognized *both* ethnicities on the second Monday of October, or could have provided the Indigenous People with their own holiday, or could have taken any approach that treats each ethnicity equally under the law. (Of course, proceeding by Executive Order in any respect is not within Mayor Kenney's authority, as detailed below.)

## A FOCUSED RECITATION OF HISTORY OF THE "INDIGENOUS PEOPLE" AS IT RELATES TO THIS ACTION

49.     The historic record also demonstrates that slavery and other wrongdoings were practiced in North America long before and irrespective of Christopher Columbus's arrival.

50.     At no fault of the "Indigenous People" living today, some of their ancestry contains irrefutable evidence of wrongdoing of massive proportions regarding the practice of slavery.

51.     It is well established that when Christopher Columbus made landfall in what is now the Bahamas, he came into contact with tribal people referred to as the "Caribs" and "Tainos."

52.     When Christopher Columbus conversed with the Tainos, they informed him, and he later learned first-hand, that the Caribs were going from island to island in the West Indies, capturing Tainos, murdering and eating the Taino men, castrating and enslaving the Taino boys – and then, when they matured into men, killing and eating them; eating the rest of the Taino children; kidnapping and raping "all the [Taino] women they can take"; and then, when the rape victims gave birth, eating the babies (Bartolomé de las Casas's Digest of Columbus's Log Book; *Historia de las Indias*, Chapter 63; Letter of Columbus dated February 15, 1493; Letter of Dr. Diego

13

Chanca [from whence the quote comes]) ("They say that man's flesh is so good, that there is nothing like it in the world[.]").

53.     As for the Tainos, the source materials indicate Christopher Columbus's relationship with the Tainos was entirely peaceful.

54.     Columbus reported favorably to the Crown about the Tainos and he praised them for their simplicity and gentleness.

55.     Even after Christopher Columbus was "deprived of his gubernatorial power of the Indies, and in the face of [another ruler's] sinister machinations and tyranny, Columbus exerted his influence as best he could to protect the indigenes. Columbus petitioned the Court of Spain, resulting in an 'instructions' to the settlers from the Crown that included 'a very specific clause all the Indians of Hispaniola were to be left free, not subject to servitude, unmolested and unharmed and allowed to live like free vassals under law just like any other vassal in the Kingdom of Castile[.]'" *Id.* at Report II (citing Book II, 83).

56.     Stanford University Professor Emeritus Carol Delaney, who left her tenured university position to dedicate ten years of her life to travel the world in the study of Columbus, reports that all the tired calumny repeatedly charged against Christopher Columbus is simply a collection of lies.  "[H]e's been terribly maligned," she wrote of Columbus, by revisionists who are "blaming [him] for things he didn't do."[8]

57.     Similarly, the continental tribes' people were also not free from widespread wrongdoing according to today's standards.

---

[8] Carol Delaney, *Columbus and the Quest for Jerusalem* (Sept. 20, 2011). This scholarly work is generally regarded as the most authoritative book on the subject.

58.     In fact, Native American Indian Tribes engaged in systemic ownership and trade of slaves.

59.     For many decades, "scholars peered at the painful and complex topic of American slavery through a purely 'black-white' lens—in other words, black slaves  who  had  white masters.  The sad reality that some Native Americans (in  particular,  the  Creek,  Cherokee, Choctaw, Chickasaw, and Seminole, or 'the Five Tribes') also participated in chattel and race-based slavery, was rarely acknowledged in the historical annals."[9]

60.     National Museum of the American Indian Curator – Paul Chaat Smith – noted that "it is imperative to provide . . . [the] public with an unflinching history, even when doing so is painful. . . . In the case of the Trail of Tears and the enslavement of blacks by prominent members of all five so-called 'Civilized Tribes' (Cherokee, Chickasaw, Choctaw, Creek and Seminole), Smith went one step further, likening the ugly truth of history to a 'mangy, snarling dog standing between you and a crowd-pleasing narrative.'"[10]

61.     Smith further stated: "The Five Civilized Tribes were deeply committed to slavery, established their own racialized black codes, immediately reestablished slavery when they arrived in  Indian  territory,  rebuilt  their  nations  with  slave  labor,  crushed  slave  rebellions,  and enthusiastically sided with the Confederacy in the Civil War."[11]

---

[9] Nakia Parker, *Black Slaves, Indian Masters: Slavery, Emancipation, and Citizenship in the Native American South, by Barbara Krauthamer (2013)*, Not Even Past produced by The University of Texas at Austin (March 26, 2014), https://notevenpast.org/black-slaves-indian-masters-slavery-emancipation-and-citizenship-in-the-native-american-south-by-barbara-krauthamer-2013/, attached as **Exhibit "H."**

[10] Ryan P. Smith, *How Native American Slaveholders Complicate the Trail of Tears Narrative* (March   6,   2018),   https://www.smithsonianmag.com/smithsonian-institution/how-native-american-slaveholders-complicate-trail-tears-narrative-180968339/, attached as **Exhibit "I."**

[11] *Id.*

62.     Tiya Miles – an African American historian at the University of Michigan – agrees: "[S]he [has] meticulously laid out primary-source evidence to paint a picture of Indian/African American relations in the years leading up to the Civil War."[12]

63.     Miles stated: "The Cherokee owned slaves for the same reasons their white neighbors did. They knew exactly what they were doing. In truth, . . . the Cherokee and other Civilized Tribes were not that complicated. They were willful and determined oppressors of blacks they owned, enthusiastic participants in a global economy driven by cotton, and believers in the idea that they were equal to whites and superior to blacks."[13]

64.     Importantly, "[n]one of this lessens the very real hardship endured by Cherokees and other Native Americans compelled to abandon their homelands as a result of the Indian Removal Act."[14]

## MAYOR JAMES F. KENNEY HAS EXHIBITED A LONG PATTERN OF DISCRIMINATION AGAINST ITALIAN AMERICANS

65.     In issuing Executive Order 2-21, Mayor Kenney has selectively chosen which ethnic group to support at the government level, and which ethnic group to condemn.

66.     While a consistent pattern of official discrimination is not necessary to predicate a violation of the Equal Protection Clause, Mayor Kenney has repeatedly taken steps that forms an unmistakable pattern of racial discrimination against Italian Americans. A *few* examples are detailed below.

---

[12] *Id.*

[13] *Id.*

[14] *Id.*

67.    On June 3, 2020, Mayor Kenney ordered the immediate removal with the cover of nighttime (at 1:00 a.m. in the morning) of the Frank L. Rizzo statue from the steps of the Municipal Services Building,[15] thus unilaterally condemning to extinction a widely beloved statue of an iconic Italian American citizen.[16, 17, 18]

---

[15] To Plaintiffs' knowledge, other Philadelphia statues that were heavily vandalized during the civil unrest following the death of George Floyd remain. For instance, a statue of outspoken abolitionist Matthias Baldwin – located outside of City Hall – was defaced with the messages "colonizer" and "murderer[,]" red paint was also tossed on the statue, yet it was not removed. Zachary Evans, *Park Volunteer Outraged over Vandalism of Philadelphia Abolitionist Statue . . .*, National Review (June 11, 2020), https://www.nationalreview.com/news/park-volunteer-outraged-over-vandalism-of-monument-to-philadelphia-abolitionist-he-was-blm-before-there-was-a-slogan/, attached hereto as **Exhibit "J."**

[16] The Associated Press, *Philadelphia removes controversial Frank Rizzo statue overnight*, Penn Live, (June 3, 2020), https://www.pennlive.com/news/2020/06/philadelphia-removes-controversial-frank-rizzo-statue-overnight.html, attached as **Exhibit "K."** ("Saying he 'never liked' it, Mayor Jim Kenney on Monday said he had planned to move the statue later this month. 'I can't wait to see it go away.' Kenney said.")

[17] Plaintiffs' counsel in this action also represents the Frank L. Rizzo Monument Committee in a pending federal action against these same Defendants for illegally removing the Frank Rizzo statue from the steps of the Municipal Services Building. (*Frank L. Rizzo Monument Committee v. City of Philadelphia, et al.*, Case Number 2:20-cv-03245-CDJ filed in the United States District Court for The Eastern District of Pennsylvania.)

[18] Frank L. Rizzo ("Frank Rizzo"), a South Philadelphia native, was a prominent Italian American, and the son of Italian immigrants. Frank Rizzo's father came to the United States from Calabria, Italy with nothing to his name but through hard work and perseverance, was able to establish himself and his family in the Philadelphia community. The Rizzo family was, and still is, known to Philadelphia Italian Americans as an example of Italian immigrants coming to this country with nothing and rising through the ranks of the City to eventually become Mayor – the first and only Italian American Mayor and Police Commissioner of Philadelphia. Indicative of Frank Rizzo's prominence in the Italian American community is that local Philadelphians still maintain the Frank L. Rizzo Monument Committee and proudly display a banner with his picture and the text "Philadelphia's First Italian Mayor and Police Commissioner" at the annual Columbus Day Parade even to this day, almost thirty (30) years after his death. *See History of Italian Americans in Philadelphia*, Wikipedia, https://en.wikipedia.org/wiki/History_of_Italian_Americans_in_Philadelphia ("Notable people . . . Frank Rizzo, [f]irst and only Italian Philadelphia Police Commissioner [and] 93rd mayor"), attached as **Exhibit "L."**

68.     In addition to violating the laws and regulations of the City of Philadelphia in surreptitiously removing the Frank Rizzo statue in the middle of the night, Defendants further abused the Philadelphia Italian American community by refusing to return the Statue to the Frank L. Rizzo Monument Committee, its lawful owner.

69.     After that illegal act, in mid-June 2020, Mayor Kenney was again poised to act under cover of night. Plaintiffs' counsel was notified by a whistle-blowing City Hall employee that Mayor Kenney hired a non-union rigger to remove the Christopher Columbus Statue from Marconi Plaza later that evening.[19] But for that tip, and an immediate injunction action brought by counsel on Sunday afternoon at 4:00 p.m., that Statue would no longer be standing in South Philadelphia. (That litigation is still pending in multiple parts before the Philadelphia Court of Common Pleas and the Commonwealth Court of Pennsylvania.[20])

70.     At the same time, when the City of Philadelphia was faced with widespread riots and protests that left businesses ravished and public property destroyed, particularly along Walnut Street (where one notable building was literally burned to a crisp), Mayor Kenney "waive[d] all

---

[19] "The Christopher Columbus Monument was originally erected on the Centennial Exposition grounds at the intersection of Fountain and Belmont Avenues, near the Conservatory and dedicated on October 12, 1876 as a tribute from Italy to America. . . . On the front cap of the pedestal are the words 'Presented to the city of Philadelphia by the Italian Societies'. . . . On the remaining two sides of the pedestal are the coats of arms of Italy and the United States." Statue of Christopher Columbus                        (Philadelphia),                        Wikipedia, https://en.wikipedia.org/wiki/Statue_of_Christopher_Columbus_(Philadelphia),      attached      as **Exhibit "M;"** *see also Fifth Agricultural Report & Centennial Report – 1876 – KANSAS, Page 99* ("A statue of colossal size made in Italy, and dedicated during the summer with imposing ceremonies; a representative of Victor Emanuel, King of Italy, having come to assist in the ceremonies. It was the gift of Italians in America."), attached as **Exhibit "N."**

[20] *Friends of Marconi Plaza, et al. v. City of Philadelphia, et al.*, Phila. Ct. Com. Pl., Docket No. 000741; *Friends of Marconi Plaza, et al. v. City of Philadelphia, et al.*, Pa. Commw. Ct., Docket No. 929 CD 2020.

protest-related code violations[.]"[21] He further waived all code violations "for all forms of disorderly conduct as well as failure to disperse and curfew violations."[22]

71.     Mayor Kenney publicly stated:

My decision to waive these violations is not a statement on the validity of the individual citations. Rather, it is a recognition of the core concerns that caused thousands to demonstrate on the streets of Philadelphia. In waiving these notices, I recognize that those issues are vitally important, that the pain of those marching is very real, and that their message — Black lives matter — needs to be heard every day until systemic racism is fully eradicated from this city and nation.[23]

72.     But when Italian American residents from South Philadelphia gathered at the Christopher Columbus Statue in Marconi Plaza that Sunday evening to prevent it from being vandalized, Mayor Kenney labeled them "vigilantes" and ordered them to "stand down[.]"[24]

73.     To rub salt in the Italian wound, on or about June 16, 2020, Mayor Kenney ordered, again without any legitimate basis but acting on his belief that "vigilantes" were roaming South Philadelphia, the reassignment of Captain Lou Campione from his command in South Philadelphia.

74.     In response, the Fraternal Order of Police formally stated:

A 43-year veteran of the department, Captain Campione is well respected by his officers, fellow commanders and, most importantly the community he has served tirelessly. Captain Campione's dedication to the community he serves is second to none and is the Gold Standard in Police Commands. The Mayor and Police leadership are more concerned with appeasing the anarchist mobs descending upon

---

[21] Emily Scott, *Mayor Kenney Waives code violation notices for recent Philly protests*, WHYY (July 8, 2020), https://whyy.org/articles/mayor-kenney-waives-code-violation-notices-for-recent-philly-protests/, attached as **Exhibit "O."**

[22] *Id.*

[23] *Id.*

[24] Mark Zimmaro, *Campione exiled, is Columbus next?*, South Philly Review (June 19, 2020), https://southphillyreview.com/2020/06/19/campione-exiled-is-columbus-next/, attached as **Exhibit "P."**

our city and are less concerned about our citizens, our neighborhoods and the overall public safety of our great city.[25]

75.     As yet additional and more recent acts against the Italian American community, Mayor Kenney kicked Italian Americans to the bottom of the COVID-19 vaccination barrel.[26]

76.     On February 19, 2021, the City, at Mayor Kenney's direction, released the first 20 Philadelphia zip codes eligible to receive the COVID-19 vaccine.  The 20 zip codes were supposed to be areas that displayed the "highest COVID-19 incidence and deaths."[27]

77.     The zip code 19148 – that is home to the largest concentration of Italian Americans in Philadelphia – was conspicuously omitted from the list.

78.     Based on the City's own data, on February 19, 2021 when Defendants released the first 20 zip codes of those eligible for the vaccine, 19148 would have tied for *fifth* on the list of vaccine eligible zip codes with respect to most COVID-19 deaths and seventh with respect to most hospitalizations.[28]

---

[25] Philadelphia Fraternal Order of Police Lodge #5 (@FOPLodge5), Twitter (June 16, 2020, 10:03 AM), https://twitter.com/FOPLodge5/status/1272892520545095686/photo/1, attached as **Exhibit "Q."**

[26] The City of Philadelphia has prioritized certain racial and ethnic groups in their vaccine distribution to the detriment of Italian Americans. *See Philadelphia Covid-19 Vaccine Distribution Plan*, Department of Public Health (March 3, 2021), https://www.phila.gov/media/20210305111041/Phila_Vaccine_Distribution_Plan_030321-1.pdf, attached as **Exhibit "R."**

[27] Allie Miller, *Walk-up, 24-hour COVID-19 vaccine site now open to eligible Philly residents*, Philly Voice (February 19, 2021), https://www.phillyvoice.com/walk-up-covid-19-vaccine-clinic-temple-philadelphia/, attached as **Exhibit "S."**

[28] Plaintiffs further note that if a death to population or hospitalization to population ratio was used, 19148 would still rank sixth and fourteenth respectively on the list of 20 zip codes selected. These estimates are based on data that is publicly available on the City's website. *See* OpenDataPhilly, https://www.opendataphilly.org/dataset?q=covid.

79.     Between March 17-22, 2021, Defendants organized a "walk-up" vaccination clinic at the Pennsylvania Convention Center for residents that "live in one of 22 selected zip codes, which have so far seen lower vaccination rates."[29]

80.     Peculiarly, zip code 19148 was still omitted from the list of eligible zip codes despite showing higher deaths and hospitalizations than many of the selected zip codes and the people in 19148 not previously being eligible for vaccination.[30]

81.     Mayor Kenney also has a long track record of stereotyping Italian Americans and making derogatory comments towards them.

82.     For instance, in a 2016 rant by Mayor Kenney about immigration and his desire for Philadelphia to remain a sanctuary city, he stated: "If this were Cousin Emilio or Cousin Guido, we wouldn't have this problem because they're white."[31]

**COUNT I**
**42 U.S.C. § 1983**
**EQUAL PROTECTION**
**ALL PLAINTIFFS v. ALL DEFENDANTS**

---

[29] Sean Collins Walsh, *Pennsylvania Convention Center vaccine site will start taking walk-ups*, The Philadelphia Inquirer (March 16, 2021), https://www.inquirer.com/health/coronavirus/live/covid-coronavirus-vaccine-philadelphia-pa-nj-stimulus-checks-20210316.html#card-2105496193, attached as **Exhibit "T."**

[30] James Garrow, *Open access at the Center City Vaccination Center for six days only!*, City of Philadelphia (March 16, 2021), https://www.phila.gov/2021-03-16-open-access-at-the-center-city-vaccination-center-for-six-days-only/, attached as **Exhibit "U."**

[31] Mike Newall, *Newall: Under pressure to smile, Mayor Kenney reviews his rookie season*, The Philadelphia Inquirer (Dec. 20, 2016), https://www.inquirer.com/philly/news/politics/20161221_Newall__An_unsmiling_Mayor_Kenney_reviews_his_rookie_season.html, attached as **Exhibit "V;"** *Guido* (slang), Wikipedia, https://en.wikipedia.org/wiki/Guido_(slang) (last visited March 15, 2021) ("Guido . . . is a North American ethnic slur or slang term, often derogatory, for a working-class urban Italian-American."), attached as **Exhibit "W."**

83.     Plaintiffs hereby incorporate by reference all of the paragraphs of this Complaint as though fully set forth herein at length.

84.     42 U.S.C. § 1983 permits individuals and organizations to sue governmental actors to enforce constitutional rights as well as rights created by federal statutes.

85.     "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]" 42 U.S.C. § 1983.

86.     Local governing bodies are deemed to be "persons" within the meaning of Section 1983 and can be sued directly under the act for monetary, declaratory, or injunctive relief.

87.     To establish municipal liability, a plaintiff must (1) demonstrate the existence of an unlawful policy or custom, and (2) prove that the municipal practice was the proximate cause of the injury.

88.     To establish causation, a plaintiff must allege a "plausible nexus" or "affirmative link" between the violation and the municipality's custom or practice.

89.     Unequal treatment is a type of personal injury that has long been recognized as judicially cognizable and virtually every circuit court has reaffirmed – as has the Supreme Court— that a discriminatory classification is itself a penalty, and thus qualifies as an actual injury for standing purposes, where a citizen's right to equal treatment is at stake.

90.     Mayor Kenney's Executive Order discriminates against Italian Americans by repealing a holiday that recognizes their ethnicity while simultaneously awarding a new holiday, on that same day, to a different but similarly situated group.

91.     Mayor Kenney's Executive Order, discriminating against one ethnic group in favor of another ethnic group, was issued without a compelling government interest and is not narrowly tailored to serve any government interest.

92.     The Equal Protection Clause of the Fourteenth Amendment directs that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

93.     The Equal Protection Clause applies to government classifications. This occurs when government action imposes a burden or confers a benefit on one class of persons to the exclusion of others. Government classifications may be "facial" or "in effect."

94.     If a classification appears on the face of the government mandate (i.e., in the express words of the order), it is subject to equal protection scrutiny.

95.     The classification in this action appears on the face of Mayor Kenney's Executive Order 2-21.

96.     The order reads, in part: "The City holiday celebrated on the second Monday in October, formerly known as Columbus Day, shall now be designated as Indigenous Peoples' Day." Executive Order No. 2-21, **Exhibit "A."**

97.     Classifications appear on the face of this Executive Order in two regards: first, the order references Columbus Day – which is a holiday widely known to recognize Italian Americans – and, second, redesignates that holiday to the "Indigenous People," a term widely understood to refer to a different ethnic group.

98.     Even if Defendants' Executive Order is facially neutral, it is subject to equal protection scrutiny if it has the "effect of" distributing burdens and benefits unequally. It is enough that the Defendants' Executive Order produced an unequal effect.

99.     Mayor Kenney's Executive Order 2-21 has the effect of distributing burdens and benefits unequally between Italian Americans and the Indigenous Peoples by replacing a holiday meant to recognize the contributions and hardships of Italian Americans with a holiday that recognizes the contributions and hardships of the Indigenous Peoples.

100.     Defendants' Executive Order, which contains 'suspect classifications,' is to be subject to strict scrutiny and can be justified only if it furthers a compelling government purpose and, even then, only if no less restrictive alternative is available.

101.     This Court should apply the rigorous "strict scrutiny" test to Defendants' action; a standard under which a challenged state action will be upheld only if it advances a compelling state interest *and* is narrowly tailored to meet that interest.

102.     Strict scrutiny is applied where the challenged action or legislation involves a "suspect" classification, i.e., a classification based on race, ethnicity, alienage, or national origin.

103.     A successful equal protection claim requires proof that the plaintiff was subjected to intentional or purposeful discrimination.

104.     Notably, intentional discrimination need not be motivated by ill will, enmity, or hostility to contravene the Equal Protection Clause – all that is required is an intent to treat two groups differently.

105.     To show discriminatory purpose, Plaintiffs only need to demonstrate that Defendants issued Executive Order 2-21 at least partially because the action would benefit or burden an identifiable group.

106.    Had Mayor Kenney not intended to treat two groups differently, he would have, could have, and should have issued an executive order that recognizes both groups equally.

107.    Both the Italian Americans and Indigenous People are directly impacted by Defendants' decision to recognize just one group's ethnicity and hardships on the second Monday in October.

108.    Both the Italian Americans and Indigenous Peoples' history contain controversial actions undertaken by their distant ancestors.

109.    Accordingly, the Court should review Executive Order 2-21 under the strict scrutiny standard to determine if the Order serves a compelling government interest and, if so, it is narrowly tailored to serve that interest.

110.    For all of the reasons stated herein, Executive Order 2-21 fails strict scrutiny analysis, and is therefore unconstitutional under the Equal Protection Clause.

**COUNT II**
**DECLARATORY JUDGMENT**
**ITALIAN AMERICANS ARE A PROTECTED CLASS**
**ENTITLED TO EQUAL PROTECTION UNDER THE U.S. CONSTITUTION**
**ALL PLAINTIFFS v. ALL DEFENDANTS**

111.    Plaintiffs hereby incorporate by reference all of the paragraphs of this Complaint as though fully set forth herein at length.

112.    Italian Americans are an ethnic group that warrant protection from discrimination under the Equal Protection Clause of the United States Constitution.

113.    An actual controversy exists between the Parties within the meaning of 28 U.S.C. § 2202, which is of sufficient immediacy and reality to warrant declaratory relief.

114. Mayor Kenney – by both his words and deeds as set forth above – apparently does not recognize the constitutional reality that Italian Americans are a protected class of people that cannot be discriminated against under the Equal Protection Clause.

115. Plaintiffs therefore seek a declaratory judgment from this Court acknowledging that Italian Americans are a protected class entitled to Equal Protection under the United States Constitution.

**COUNT III**
**DECLARATORY JUDGMENT**
**MAYOR KENNEY'S EXECUTIVE ORDER 2-21 VIOLATES**
**THE EQUAL PROTECTION CLAUSE OF THE U.S. CONSTITUTION**
**ALL PLAINTIFFS v. ALL DEFENDANTS**

116. Plaintiffs hereby incorporate by reference all of the paragraphs of this Complaint as though fully set forth herein at length.

117. Mayor Kenney's Executive Order 2-21 – that *cancels* Columbus Day – violates the Equal Protection Clause of the United States Constitution. *See* Executive Order 2-21, **Exhibit "A."**

118. An actual controversy exists between the Parties within the meaning of 28 U.S.C. § 2202, which is of sufficient immediacy and reality to warrant declaratory relief.

119. Plaintiffs seek a declaratory judgment from this Court pronouncing Executive Order 2-21 unconstitutional and violative of the Equal Protection Clause.

**COUNT IV**
**VIOLATIONS OF THE PHILADELPHIA HOME RULE CHARTER**
**ALL PLAINTIFFS v. ALL DEFENDANTS**

120. Plaintiffs hereby incorporate by reference all of the paragraphs of this Complaint as though fully set forth herein at length.

121. The Mayor of Philadelphia does not have the power to unilaterally repeal a City holiday and replace it with a different holiday of his choosing.

122.     The Philadelphia Home Rule Charter provides that "[r]egulations pertaining to . . . holidays . . . shall be submitted by the Personnel Director for approval to the Civil Service Commission and Administrative Board . . . [and a]fter the requisite approvals shall have been obtained, the regulations shall be filed by the Personnel Director with the Department of Records, where they shall be available for public inspection for thirty days, and public notice of such filing shall be given as in the case of other regulations." Phila. Home Rule Charter § 7-400; *see also* Phila. Home Rule Charter § 7-401 ("The regulations shall provide for: . . . holidays[.]").

123.     "The approval of the Administrative Board is required of civil service regulations pertaining to . . . holidays . . . because these regulations will affect the operating budget, the expenditure of City moneys, and the availability of personnel. They should therefore be subject to the approval of the Mayor, the Director of Finance, and the Managing Director who are primarily concerned with these important phases of municipal administration." *Id.* at n. 2.

124.     "The Administrative Board shall approve or disapprove: . . . Those parts of the civil service regulations which deal with . . . holidays[.]" Phila. Home Rule Charter § 4-300.

125.     Defendants did not obtain the requisite approvals prior to issuing Executive Order 2-21 and did not provide the public with an opportunity for inspection or an opportunity to be heard.

126.     Pursuant to the Philadelphia Home Rule Charter and the Sunshine Act, as further detailed below, Plaintiffs should have the opportunity to observe and address the Civil Service Commission and Administrative Board during their deliberation process with respect to any changes in a designated holiday. Phila. Home Rule Charter § 7-400.

127.     Here, Mayor Kenney illegally circumvented all established processes and unilaterally mandated that Columbus Day be replaced by Indigenous Peoples' Day.

128.    Accordingly, Defendants' Executive Order 2-21 should be voided by the Court.

**COUNT V**
**VIOLATION OF SEPARATION OF POWERS**
**ALL PLAINTIFFS v. ALL DEFENDANTS**

129.    Plaintiffs hereby incorporate by reference all of the paragraphs of this Complaint as though fully set forth herein at length.

130.    Mayor Kenney and the City of Philadelphia must govern themselves in accordance with the Constitution of Pennsylvania, State statutes and its home rule charter.

131.    The right to engage in home rule flows from Article IX, Section 2 of the Pennsylvania Constitution, which permits a home rule municipality to "exercise any power or perform any function not denied by this Constitution, by its home rule charter or by the General Assembly at any time." Pa. Const. art. IX, § 2.

132.    Pursuant to Article IX, Section 2 of the Pennsylvania Constitution, home rule charters are subservient to limitations imposed by the General Assembly.

133.    Mayor Kenney may not bypass City Council and unilaterally legislate through an executive order.

134.    When the Mayor issues an executive order, he must not infringe upon the powers of another branch of the municipal government.

135.    The Philadelphia Home Rule Charter states that "[t]he legislative power of the City, including any such power which may hereafter be conferred on the City by amendment of the Constitution or by the laws of the Commonwealth of Pennsylvania, shall be exclusively vested in and exercised by a Council, subject only to the provisions of [the] charter." Phila. Home Rule Charter § 1-101.

136.    Each year, Philadelphia City Council designates the week encompassing the second Monday in October as "Italian American Heritage Week . . . in celebration of the festivities commemorating Columbus' historic voyage to the New World." *See* Resolution No. 170872, attached as **Exhibit "X."**

137.    The Resolution reads: "The annual Philadelphia Columbus Day Parade began in South Philadelphia in 1957, and has since become one of the City's premier ethnic celebrations." *Id.*

138.    The Resolution also recognizes The 1492 Society as the host of the annual Philadelphia Columbus Day Parade. *Id.*

139.    53 P.S. § 12127(a) provides that "[i]t shall be the duty of the mayor: . . . To recommend, by message in writing to the council, all such measures connected with the affairs of the city and the protection and improvement of its government and finances as he shall deem expedient."

140.    Mayor Kenney issued Executive Order No. 2-21 without properly recommending it to City Council despite the Order having a direct connection to the affairs of the City.

141.    Executive Order No. 2-21 directly impacts the affairs of the City since Philadelphia City Council annually recognize "Philadelphia Columbus Day." Resolution No. 170872, **Exhibit "X."**

142.    Through Executive Order No. 2-21, Mayor Kenney declared that the City of Philadelphia will no longer recognize Columbus Day.

143.    Executive Order No. 2-21 reads more like a bill or ordinance as opposed to an executive directive that falls within the powers afforded to Mayor Kenney by the Philadelphia Home Rule Charter.

144.    Mayor Kenney's Executive Order No. 2-21 states, in relevant part:

NOW, THEREFORE, I, MAYOR JAMES F. KENNEY, Mayor of the City of Philadelphia, by the powers vested in me by the Philadelphia Home Rule Charter, do hereby ORDER as follows: . . . Section 1 . . . June 19 of every year is designated a holiday for all City employees and shall be treated as such in accordance with the applicable Civil Service regulations and Administrative Board rules. . . . Section 2 . . . The City holiday celebrated on the second Monday in October, formerly known as Columbus Day, shall now be designated as Indigenous Peoples' Day. . . . The Director of Finance, Chief Administrative Officer and Deputy Mayor for Labor are directed to make appropriate notifications to effectuate this Order.

Executive Order No. 2-21, **Exhibit "A."** [32]

145.    Mayor Kenney may not direct government officials to "effectuate" an Order that legislates the replacement of a City holiday and mandates all branches of the City government recognize the same.

146.    In Section 1 of Executive Order 2-21, Mayor Kenney designates Juneteenth as a City holiday to the extent permitted by the "applicable Civil Service regulations and Administrative Board rules[.]" *Id.*

147.    **However**, Section 2 of Executive Order 2-21 is much broader, does not seek to comply with the applicable Civil Service regulations and Administrative Board rules, and mandates that the City designate and celebrate an entirely new holiday. *Id.*

148.    Section 2 of Executive Order 2-21 is clearly a legislative act that requires City Council approval.

149.    Executive Order 2-21 directly stifles City Council's annual tradition of recognizing "Philadelphia Columbus Day" through a Resolution.

---

[32] It is important to note the distinction between Section 1 of Executive Order No. 2-21, which designates Juneteenth as a City holiday "in accordance with the applicable Civil Service regulations and Administrative Board rules," from Section 2, which broadly cancels Columbus Day as a City holiday in its entirety, without regard for the Civil Service regulations or the Administrative Board rules. *See* Executive Order No. 2-21, **Exhibit "A."**

150.    The only municipal branch capable of legislating that the City of Philadelphia repeal one holiday and recognize another in its place is City Council.

151.    Mayor Kenney does not have the power to bypass this City's legislative branch by executive order and unilaterally decide which holidays the City will recognize and celebrate.

152.    Accordingly, it is appropriate for this Court to void Section 2 of Executive Order 2-21.

**COUNT VI**
**VIOLATION OF SUNSHINE ACT**
**ALL PLAINTIFFS v. ALL DEFENDANTS**

153.    Plaintiffs hereby incorporate by reference all of the paragraphs of this Complaint as though fully set forth herein at length.

154.    The Philadelphia Home Rule Charter requires that multiple municipal agencies meet, confer and approve the change of any City holiday. *See* Phila. Home Rule Charter §§ 4-300, 7-400 and 7-401.

155.    Section 7-400 of the Philadelphia Home Rule Charter requires that "[r]egulations pertaining to . . . holidays . . . shall be submitted by the Personnel Director for approval to the Civil Service Commission and Administrative Board." Phila. Home Rule Charter § 7-400.

156.    In other words, to repeal one City holiday and replace it with a new one, multiple agencies must confer and take official action to approve the change.

157.    When Mayor Kenney issued the instant Executive Order 2-21, he bypassed agencies that are required to meet to approve of any change in holidays.

158.    Mayor Kenney's Executive Order 2-21 states that "[t]he Director of Finance, Chief Administrative Officer and Deputy Mayor for Labor are **directed to make appropriate notifications to effectuate this Order**." Executive Order 2-21, **Exhibit "A."** (Emphasis added).

159. Mayor Kenney may not direct the heads of his agencies to simply "effectuate" an order without regard for the City's Charter or the Sunshine Act.

160. As required by Philadelphia Home Rule Charter § 7-400, the Civil Service Commission and Administrative Board must provide their approval to repeal and/or replace a City holiday.

161. The Civil Service Commission and the Administrative Board are agencies that fall under the Sunshine Act.

162. In reaching their decision whether to approve or deny any holiday change, the Civil Service Commission and Administrative Board must comply with the Sunshine Act.

163. The Sunshine Act mandates that the public has the right "to be present at all meetings of agencies and to witness the deliberation, policy formulation and decisionmaking of agencies is vital to the enhancement and proper functioning of the democratic process and that secrecy in public affairs undermines the faith of the public in government and the public's effectiveness in fulfilling its role in a democratic society." 65 Pa.C.S.A. § 702(a).

164. The Sunshine Act further requires that it be the "public policy of this Commonwealth to insure the right of its citizens to have notice of and the right to attend all meetings of agencies at which any agency business is discussed or acted upon as provided in this chapter." 65 Pa.C.S.A. § 702(b).

165. "Official action and deliberations by a quorum of the members of an agency shall take place at a meeting open to the public unless closed under" an application exception. 65 Pa.C.S.A. § 704.

166.    The Defendants may not simply implement Executive Order 2021 without complying with the Sunshine Act and ensuring that any and all official action be conducted at an open meeting. *Id.*

167.    To repeal or implement a City holiday, multiple municipal agencies must take official action which requires compliance with the Sunshine Act.

168.    Therefore, before any holiday may be repealed and/or instituted, the agencies with jurisdiction – as provided for in the Philadelphia Home Rule Charter – must comply with the Sunshine Act in reaching their respective decisions.

169.    Defendants issued the instant Executive Order without regard for the Sunshine Act.

170.    Accordingly, the Court should void Executive Order 2-21.

**COUNT VII**
**VIOLATION OF HOME RULE ACT 53 P.S. §§ 13131**
**ALL PLAINTIFFS v. ALL DEFENDANTS**

171.    Plaintiffs hereby incorporate by reference all of the paragraphs of this Complaint as though fully set forth herein at length.

172.    Municipalities, like the City of Philadelphia, only have as much authority as the General Assembly affords.

173.    Municipalities are creatures of the Commonwealth and possess only such powers of government as are expressly granted to them and as are necessary to carry the same into effect.

174.    A municipality is therefore powerless to enact executive orders except as authorized by statute, and executive orders not in conformity with the municipality's enabling statute will be void.

175.    Like the powers of other types of municipalities, the powers of a home rule municipality are largely constitutionally and statutorily determined.

176.    In that regard, the Pennsylvania Constitution provides that "[m]unicipalities shall have the right and power to frame and adopt home rule charters" and that pursuant to such charters, a home rule municipality "may exercise any power or perform any function not denied by this Constitution, by its home rule charter or by the General Assembly at any time." Pa. Const. art. IX § 2.

177.    Meanwhile, the Home Rule Act, 53 P.S. §§ 13101-13157, which is the enabling legislation for home rule by a first-class city like Philadelphia, provides that the City "shall have and may exercise all powers and authority of local self-government and shall have complete powers of legislation and administration in relation to its municipal functions . . .," subject to certain enumerated limitations. *Id.* at § 13131.[33]

178.    Among the limitations are that no city "shall exercise powers *contrary to*, or in *limitation* or enlargement of, powers granted by acts of the General Assembly which are . . . [a]pplicable in every part of the Commonwealth." *Id.* at § 13133.

179.    Thus, under the Home Rule Act, the General Assembly gave the City of Philadelphia "complete powers of legislation and administration *in relation to its municipal functions*," 53 P.S. § 13131 (emphasis added), but also prohibited it from "exercise[ing] powers *contrary to*, or *in limitation* or enlargement of," statutes enacted by the General Assembly "which are . . . [a]pplicable in every part of the Commonwealth." *Id.* at § 13133 (emphasis added).

180.    Mayor Kenney's Executive Order 2-21 runs afoul of this prohibition.

181.    44 P.S. § 32 (Columbus Day) mandates that:

> The Governor shall issue, annually, his Proclamation designating and setting apart October 12 as Columbus Day, and calling upon the people of the Commonwealth, the public schools and other

---

[33] Philadelphia is the only first-class city in Pennsylvania. It adopted its home rule charter to the terms of the Home Rule Act on April 17, 1951.

educational institutions and historical organizations to observe the discovery of the New World with appropriate exercises and programs, to the end that the discovery of America shall be commemorated each year.

182.    However, in violation of 44 P.S. § 32, Mayor Kenney legislates that: "The City holiday celebrated on the second Monday in October, formerly known as Columbus Day, shall now be designated as Indigenous Peoples' Day." Executive Order 2-21, **Exhibit "A."**

183.    The General Assembly has statutorily mandated that this Commonwealth, its people, public schools, and other public institutions are to recognize Columbus Day.

184.    Mayor Kenney's Executive Order 2-21 illegally repeals Columbus Day as a City recognized holiday and thereby violates 44 P.S. § 32.

185.    The General Assembly has also designated Columbus Day as a holiday of this Commonwealth by way of 44 P.S. § 11.

186.    Specifically, 44 P.S. § 11 designates as holidays "[t]he following days and half days, namely: . . . the second Monday in October, known as Columbus Day[.]"

187.    Mayor Kenney's Executive Order 2-21 runs contrary to a Commonwealth statute – 44 P.S. § 11 – which is binding on the City of Philadelphia.

188.    Therefore, Section 2 of Executive Order 2-21 is void since it attempts to override an enacted and binding statute of this Commonwealth.

189.    Accordingly, this Honorable Court should declare Section 2 of Mayor Kenney's Executive Order 2-21 void since it is preempted by two Commonwealth statutes that run to the contrary.

## CLAIMS FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against both Defendants as follows:

a.      Declaring Executive Order 2-21 void;

b.      Enjoining Mayor Kenney and the City of Philadelphia from taking any action to implement Executive Order 2-21 insofar as it seeks to cancel Columbus Day in anyway;

c.      Declaring Italian Americans a protected class entitled to Equal Protection under the U.S. Constitution;

d.      Declaring Mayor James F. Kenney's Executive Order 2-21 violates the Equal Protection Clause of the U.S. Constitution;

e.      Awarding Plaintiffs' attorney's fees;

f.      Awarding Plaintiffs' costs of the proceeding; and

g.      Such other and further relief as the Court deems just and equitable.

Respectfully submitted,

**BOCHETTO & LENTZ, P.C.**

Dated: April 6, 2021          By:      */s/ George Bochetto*
                                        _____
                                        George Bochetto
                                        PA Attorney ID No. 27783
                                        David P. Heim
                                        PA Attorney ID No. 84323
                                        Matthew L. Minsky
                                        PA Attorney ID No. 329262
                                        Bochetto & Lentz, P.C.
                                        1524 Locust Street
                                        Philadelphia, PA 19102
                                        Telephone: (215) 735-3900
                                        gbochetto@bochettoandlentz.com
                                        dheim@bochettoandlentz.com
                                        mminsky@bochettoandlentz.com

                                        *Attorneys for Plaintiffs*