## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **CONFERENCE OF PRESIDENTS OF MAJOR ITALIAN AMERICAN ORGANIZATIONS, INC., et al.,** | : : : : | **Civil Action** |
| **Plaintiffs,** | : : | **No. 2:21-cv-01609-CDJ** |
| **v.** | : : | |
| **CITY OF PHILADELPHIA, et al.,** | : : | |
| **Defendants.** | : : : | |

## <u>ORDER</u>

**AND NOW**, on this _____ day of _____, 2021, upon consideration of

Defendants' Motion to Dismiss, Plaintiffs' Opposition thereto, and the record as a whole, it is

hereby **ORDERED** that Defendants' Motion to Dismiss is **DENIED**.


**BY THE COURT:**


_____
C. Darnell Jones, II, U.S.D.J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CONFERENCE OF PRESIDENTS OF** | : | |
| **MAJOR ITALIAN AMERICAN** | : | |
| **ORGANIZATIONS, INC., et al.,** | : | **Civil Action** |
| | : | |
| **Plaintiffs,** | : | **No. 2:21-cv-01609-CDJ** |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA, et al.,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |
| | : | |

**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Plaintiffs, The Conference of Presidents of Major Italian American Organizations, Inc. ("COPOMIAO"), Councilmember Mark F. Squilla, The 1492 Society and Jody Della Barba, by and through undersigned counsel, hereby file this Memorandum of Law in Opposition to Defendants' Motion to Dismiss.

**INTRODUCTION**

This case – at its core – is about the City and its top executive official, Mayor Kenney, issuing an executive order that, on its face, purposely discriminates against Italian Americans in Philadelphia by replacing a well-established Italian American holiday – Columbus Day – with another ethnicity's holiday.  The detailed facts set forth in the Complaint establish the Mayor's executive order has both a discriminatory purpose and effect to deny Italian Americans equal treatment under the law.  Indeed, the Complaint details the list of instances where Mayor Kenney has shown an unmistakable animus toward Italian Americans in Philadelphia, including public

statements disparaging Italian Americans, and official acts targeting iconic Italian Americans who are part of Philadelphia's history, ending with his latest act of cancelling the Italian American holiday in favor of "Indigenous People's Day."  Government conduct that is based on racial or ethnic classifications and expressly favors one ethnic group over another ethnic group has long been prohibited by the Equal Protection Clause of the 14th Amendment to the United States Constitution, which mandates "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, §1.  This case is also about the Mayor's executive order being issued by way of Mayoral fiat in direct violation of local and state laws, over which this Court has supplemental jurisdiction.

The Defendants have moved to dismiss the Complaint in its entirety, refusing to acknowledge the facts plead in the Complaint, arguing, among other things, Plaintiffs' lack standing, the Defendants' conduct in issuing the discriminatory executive order is protected "government speech," and that Plaintiffs fail to plead facts establishing a viable constitutional or state law cause of action.  The Defendants' Motion to Dismiss should be dismissed because – as fully set forth herein – there is no question that the conduct at issue here is in violation of a fundamental principle on which this Country was formed – governments must not be permitted to treat ethnic groups differently based on their ethnicity.  The Mayor and the City dangerously believe otherwise.  This Court, as the final protector of citizens' constitutional rights, should not countenance such divisive and ultimately unconstitutional government conduct.  The Motion should be denied.

## STATEMENT OF FACTS

The facts herein are drawn from the Complaint and the exhibits thereto, which this Court must accept as true on a Rule 12 motion, as the Defendants have not provided any support for factual allegations outside of the Complaint.[1]

Italian immigrants to America have, for two centuries, identified with Christopher Columbus as emblematic of both Italy and their journey to the United States.  Ex. A ¶¶ 26-27. These same Italian Americans have been the subject of discrimination, including the lynching of eleven Italian Americans on March 14, 1891, in New Orleans.  *Id.* ¶ 28.  Columbus Day was recognized to shine a light on unlawful discrimination against Italian Americans, and was a source of pride in the face of widespread discrimination against Italian Americans— discrimination from groups such as the Ku Klux Klan.  *Id.* ¶¶ 30-32.  Pushing back upon that sentiment, the federal government began celebrating Columbus Day in 1934.  *Id.* ¶¶ 34-35.

Unfortunately, Italian Americans in Philadelphia reside in a city with a Mayor, Defendant Kenney, for whom discrimination against Italian Americans appears to be a long-held belief, and one that he now seeks to enforce by executive order.  In 2016, in response to a concern over sanctuary cities, Mayor Kenney immediately sprang to using derogatory language about Italian Americans: "If this were Cousin Emilio or Cousin Guido, we wouldn't have this problem because they're white."  *Id.* ¶ 82.

On June 3, 2020, Mayor Kenney acted under cover of darkness to remove (and impound) the iconic statue of former Mayor Frank L. Rizzo from the steps of the Municipal Services

---

[1] *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016) (requiring an answer, signed declaration, or otherwise presenting facts to make anything other than a facial challenge to jurisdiction).  On a facial challenge to standing under Rule 12(b)(1) and a motion to dismiss under Rule 12(b)(6), "the Court limits its inquiry to the facts alleged in the complaint, documents that are attached to, integral to, or explicitly relied upon in the complaint, and matters of public record."  *Freeman v. Early Warning Servs.*, LLC, 443 F. Supp. 3d 581, 583 (E.D. Pa. 2020).  Defendants have provided no support by way of exhibits for their factual assertions contrary to the Complaint.

Building: the excuse given for removing the statue of one of Philadelphia's most prominent Italian Americans was that it was vandalized—despite the fact that other vandalized statues were not torn down suddenly at night by the City.  *Id.* ¶¶ 67-68.

Later in June 2020, Mayor Kenney attempted to remove ***yet another*** statue important to the Italian American community, the 144-year-old statue of Christopher Columbus in Marconi Plaza, but was prevented by litigation brought swiftly to prevent the likely destruction of the marble sculpture.  *Id.* ¶ 69.  In fact, although Mayor Kenney waived code violations for disorderly conduct with respect to some riots and public disturbances in Philadelphia during the summer of 2020, he labeled Italian Americans protecting the Columbus statue "vigilantes" and ordered them to "stand down[.]"  *Id.* ¶¶ 70-72.  In connection with the issue in Marconi Plaza, Mayor Kenney went so far as to remove an Italian American police captain based upon his allegation concerning "vigilantes" in largely Italian American South Philadelphia.  *Id.* ¶¶ 72-73.

Shockingly, Mayor Kenney even used the City's response to the COVID-19 crisis to discriminate against Italian Americans, by fudging the City's vaccination response criteria to lower the priority of a heavily Italian American zip code.  *Id.* ¶¶ 75-80.

**Councilman Squilla Commissions Research on**
**Christopher Columbus and City Council Legislatively Acts to Recognize Columbus Day**

In light of Mayor Kenney's antipathy to the Italian American community, it is relevant that in 2018, Plaintiff and Councilman Squilla enlisted Robert F. Petrone, Esq.—a Philadelphia attorney (an Assistant District Attorney) and renowned Christopher Columbus expert—regarding the true historical record of Christopher Columbus.  *Id.* ¶ 37.  Mr. Petrone's credentials made him the ideal person to take on this project, as he was conversant with the relevant primary source materials that were written during and shortly after Christopher Columbus's life, was fluent in Spanish, and he was well-versed at interpreting 15th century Spanish texts.  *Id.* ¶ 38.

After examining the historical texts in their original language and performing additional research, Mr. Petrone provided Philadelphia City Council with two reports detailing his findings with respect to the life and voyages of Christopher Columbus. *Id.* ¶¶ 39-41. Mr. Petrone's reports demonstrate that the primary historical sources unanimously bear out that Christopher Columbus was the first recorded civil-rights activist of the Americas, having (1) prohibited the mistreatment and the enslavement of the tribal peoples during his tenure as governor of the West Indies; (2) established the first "underground railroad" of the Americas by traveling around the West Indies on his Second Voyage; and (3) successfully petitioned the King of Spain to promulgate the first civil rights legislation of the Americas decreeing that "all the Indians of Hispaniola were to be left free, not subject to servitude, unmolested and unharmed and allowed to live like free vassals under law just like any other vassal in the Kingdom of Castile." *Id.* ¶¶ 42-43.

Mr. Petrone's reports supported with scholarship the longstanding support of Philadelphia's City Counsel for Columbus Day. Each year, Philadelphia City Council designates the week encompassing the second Monday in October as "Italian American Heritage Week . . . in celebration of the festivities commemorating Columbus' historic voyage to the New World." *Id.* ¶ 136. City Council, the legislative body under the Home Rule Charter, further recognizes that "The annual Philadelphia Columbus Day Parade began in South Philadelphia in 1957, and has since become one of the City's premier ethnic celebrations," and that The 1492 Society is the host of the annual Philadelphia Columbus Day Parade. *Id.* ¶¶ 137-38.

**Executive Order 2-21**

Despite Philadelphia City Council having been provided with Mr. Petrone's detailed reports that conclude there is no support for the charges the City and Mayor now level against Christopher Columbus, Mayor Kenney issued Executive Order 2-21 without submitting this serious decision to City Counsel. *Id.* ¶ 44. Contrary to the Mr. Petrone's findings, and apparently unsupported by any review of the direct historical record, Defendants stated in that Order: "Columbus enslaved indigenous people, and punished individuals who failed to meet his expected service through violence and, in some cases, murder" and thereby decided to cancel Columbus Day by replacing it with Indigenous Peoples Day. *Id.*

The Executive Order continues in this vein, excoriating a figure that City Council venerates every year and passed a resolution in support of celebrating, then proceeding to wipe from the public record: "[T]he story of Christopher Columbus is deeply complicated. For centuries, he has been venerated with stories of his traversing the Atlantic and 'discovering' the 'New World'. The true history of his conduct is, in fact, infamous. Mistakenly believing he had found a new route to India, Columbus enslaved indigenous people, and punished individuals who failed to meet his expected service through violence and, in some cases, murder . . . The City holiday celebrated on the second Monday in October, formerly known as Columbus Day, shall now be designated as Indigenous Peoples' Day." *Id.* ¶ 45. Mayor Kenney proceeded to double down on his vituperative feelings about Columbus Day through a press release, in a manner consistent with his intent to erase Italian American heritage and celebrations from Philadelphia:

> While changes to City holidays may seem largely symbolic, we recognize that symbols carry power. We hope that for our employees and residents of color, this change is viewed as an acknowledgement of the centuries of institutional racism and marginalization that have been forced upon Black Americans, Indigenous people, and other communities of color. At the same time, we are clear-eyed about the fact that there is still an urgent

need for further substantive systemic change in all areas of local government.

*Id.* ¶ 46.  Defendants thus recognize that Executive Order 2-21 is not mere speech in a vacuum—it in fact carries "power"—and they have explicitly chosen which ethnicities should be credited, supported, and approved by the City government, and which ethnicities should be shamed, disdained and canceled.

### Defendants' Impermissible Factual Attack Fails History and Logic

Only by ignoring history and the City's conduct for the past century can Defendants aver that Columbus Day does "not confer a benefit specific to any group." (Defs.' Br. 11.)  It is widely understood and accepted that the institution of Columbus Day occurred to recognize Italian Americans. *Id.* at ¶¶ 26-36.  In fact, Philadelphia's own City Council recognizes Columbus Day as "one of the City's premier ethnic celebrations" and "the active participation of the Delaware Valley's Italian American community" in Columbus Day.  Ex. A at Ex. X thereto. Resolution No. 170872 specifically provides for widespread recognition of Italian American heritage on and around Columbus Day.  *Id.* ("In addition to the annual Columbus Day Parade, festivities include an Italian Festival showcasing the culture and cuisine of the people of Italy. The Italian Festival . . . includes food, dance and music from the many different diverse regions of Italy.").[2]

Plainly, Columbus Day is a holiday associated with an ethnicity, or national origin, and that association is with Italian Americans.  For Defendants to argue that it does not flies in the face of the factual record in the Complaint, which is the basis for the record on a Rule 12 motion.

---

[2] Plaintiffs respectfully request this Honorable Court take judicial notice of the fact that Columbus Day is a holiday designated to recognizing the contributions Italian Americans have made to this Nation. *See* F.R.E 201 ("The court may judicially notice a fact that is not subject to reasonable dispute because it:  . . . is generally known within the trial court's territorial jurisdiction; or  . . . can be accurately and readily determine from sources whose accuracy cannot reasonably be questioned. . . . The court may take judicial notice at any stage of the proceeding.").

In addition, Mayor Kenney has publicly proclaimed the opposite of what Defendants now argue. Specifically, Defendants attempt to argue that the Second Monday in October does not honor any one ethnic group. (Defs.' Br. 11 ("Columbus Day as a government holiday does not confer a benefit specific to any group")). However, Mayor Kenney released a public statement following the issuance of Executive Order 2-21 that expressly recognized that renaming the holiday had "power" and was not merely symbolic.  Ex. A ¶ 46.  While it is a noble act to designate a holiday in recognition of this Nation's Indigenous People (similar to the act of designating of Columbus Day to recognize Italian Americans), it is apparent that Executive Order 2-21 was issued to confer a benefit to a specific ethnic group. *Id.* The Defendants averment that the designation of the holiday that falls on the Second Monday of October confers no benefit to any individual ethnic group should not be afforded any weight by this Honorable Court. It is apparent by Mayor Kenney's own words that Indigenous Peoples' Day was established as a City holiday on the Second Monday of October to "maintain[] racial iniquities," which is a goal that inherently requires one race and/or ethnic group to receive a benefit.  *Id.* However, such benefit in this instance comes at the expense of Italian Americans.  *Id.*

### The Instant Complaint

Based on this conduct, Plaintiffs filed the Complaint, which sounds in seven counts:

- Count I, violation of the Equal Protection Clause under 42 U.S.C. § 1983;

- Count II, for declaratory judgment that Italian Americans are a protected class under the United States Constitution;

- Count III, for declaratory judgment that that Executive Order 2-21 violates the Equal Protection Clause;

- Count IV, for violation of the Philadelphia Home Rule Charter;

- Count V, for violation of separation of powers;

- Count VI, for violation of the Pennsylvania Sunshine Act;

- Count VII, for violation of the Home Rule Act.

## ARGUMENT

### A.  Plaintiffs Have Standing

There is no question in this matter that the Plaintiffs possess standing.  Jody Della Barba and The 1492 Society put on the Columbus Day parade in Philadelphia every year.  The 1492 Society is a member of COPOMIAO, which advocates for Italian American issues, such as the yearly celebrations of Columbus Day around the nation.   Councilman Squilla is a City Councilman in Philadelphia and Executive Order 2-21 imposes on the powers of City Council and impedes legislation he has sponsored in prior years celebrating Columbus Day.  Finally, all Plaintiffs are either Italian American or advocate on behalf of the interests of Italian Americans, including the celebration of Christopher Columbus and the connection, through Columbus, between Italy and America.

Standing is required for jurisdiction in a federal court. It is a threshold inquiry in every case, one for which "[t]he party invoking federal jurisdiction bears the burden of [proof]." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992); *Hassan v. City of New York*, 804 F.3d 277, 289 (3d Cir. 2015). Analyzing this requirement involves a three-part inquiry. Has at least one plaintiff suffered an "injury in fact"? *Id.* If so, is that injury "fairly . . . trace[able] to the challenged action of the defendant"? *Lujan,* 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 41-42 (1976)). And if the answer to both is yes, will that injury be "likely . . . redressed by a favorable decision"? *Id.* (quoting *Simon,* 426 U.S. at 38).

> When answering these questions, "we must assume that the party asserting federal jurisdiction is correct on the legal merits of his claim, that a decision

> on the merits would be favorable[,] and that the requested relief would be granted." *Cutler v. U.S. Dep't of Health & Human Servs.,* 797 F.3d 1173, 1179 (D.C. Cir. 2015) (internal quotation marks omitted). In other words, to withstand a "facial attack" at the motion-to-dismiss stage, a plaintiff need only plausibly allege facts establishing each constitutional requirement. *Lewis v. Casey,* 518 U.S. 343, 358, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996).

*Hassan*, 804 F.3d at 289.

To support standing, general factual allegations of injury resulting from the Defendants' conduct may suffice at the pleading stage. On a motion to dismiss, the court "presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561.

In order for this Court to have jurisdiction over the claims, at least one named plaintiff must have standing for each of the claims. *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 53 n. 2 (2006) ("The presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").

### 1.   The Discrimination Against the Plaintiffs Is an Injury In Fact

The burden to satisfy the injury in fact requirement of Article III standing is low.  In fact, the Third Circuit Court of Appeals teaches that nothing more is required than "an identifiable trifle of harm."  *Hassan*, 804 F.3d at 289.

Furthermore, "discrimination itself is [a] legally cognizable injury." *Hassan*, 804 F.3d at 293.[3] It is well established that unequal treatment is "a type of personal injury [that] ha[s] long [been] recognized as judicially cognizable . . . and virtually every circuit court has reaffirmed – as has the Supreme Court—that a discriminatory classification is itself a penalty, . . . and thus qualifies as an actual injury for standing purposes, where a citizen's right to equal treatment is at stake." *Id.* at 289-90 (quoting *Heckler v. Mathews,* 465 U.S. 728, 738 (1984); *Saenz v. Roe,* 526

---

[3] *See Hassan,* 804 F.3d at 293 ("Indeed, discrimination often has been likened to a 'dignitary tort,' . . . where [t]he tort is said to be damage itself") (internal citations and quotation marks omitted.)

U.S. 489, 505 (1999)) (internal quotation marks omitted.); *see Mardell v. Harleysville Life Ins. Co.,* 65 F.3d 1072, 1074 (3d Cir. 1995) ("[A] victim of discrimination suffers a dehumanizing injury as real as, and often of far more severe and lasting harm than, a blow to the jaw.") (internal quotation marks omitted.); *see also Sandberg v. KPMG Peat Marwick, L.L.P.,* 111 F.3d 331, 335 (2d Cir. 1997) ("The fundamental concern of discrimination law is to redress the dignitary affront that decisions based on group characteristics represent, not to guarantee specific economic expectancies."); *see also Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 294 n. 44 (W.D. Pa. 2017) ("Courts have long recognized, for example, that a bare equal protection violation is sufficient to constitute an injury in fact for the purposes of establishing Article III standing because unequal treatment under the law is harm unto itself.").

> It is true that "only ... a complainant [who] possesses something more than a general interest in the proper execution of the laws ... is in a position to secure judicial intervention." *Stark v. Wickard,* 321 U.S. 288, 304, 64 S.Ct. 559, 88 L.Ed. 733 (1944). But where a plaintiff is "asserting [his or her] own [equality] right," a claim of discrimination, even where it affects a broad class, "is not an abstract concern or 'generalized grievance.'" *Ad Hoc Comm. of Concerned Teachers v. Greenburgh # 11 Union Free Sch. Dist.*, 873 F.2d 25, 29 (2d Cir.1989) (quoting *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

*Hassan*, 804 F.3d at 291.  Although the individual situation of each Plaintiff is addressed below in greater detail, the discriminatory nature of Executive Order 2-21 is precisely the kind of discrimination that suffices for standing in federal jurisprudence.

### 2. Discrimination Against the Plaintiffs Provides a Causal Connection and Traces the Injury to the Challenged Action

"The second requirement of injury-in-fact is a causal connection between defendant's alleged conduct and the plaintiff's harm." *Hassan*, 804 F.3d at 292. When the "claimed discrimination itself . . . [is] the primary injury alleged, it follows from [the] definition of injury

in fact that the City is the cause of that injury." *Id.* at 293. (internal quotation marks omitted.)  As the Plaintiffs, as set for *infra*, are being discriminated against via Executive Order 2-21, their injury is traceable to the discriminatory nature of Executive Order 2-21.

### 3.  A Favorable Decision Will Redress the Injury

The final requirement of Article III standing is redressability. *Hassan*, 804 F.3d at 293. Redressability "requires the plaintiff to show that 'it . . . [is] likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Id.* (quoting *Lujan,* 504 U.S. at 560; *Simon,* 426 U.S. at 38.)

> Redressability is "easily established in a case where," as here, "the alleged injury arises from an identifiable discriminatory policy." *Smith v. Meese,* 821 F.2d 1484, 1494 (11th Cir.1987). While we cannot predict "the exact nature of the possible relief ... without a full development of the facts, an order enjoining the policy and requiring non-discriminatory investigation and enforcement would redress the injury." *Id.* For other plaintiffs, "the major purpose of the suit may be to obtain a public declaration that the[y are] right and w[ere] improperly treated," *see Restatement (Second) of Torts* § 901 cmt. c (1979), along with nominal damages that serve as "a symbolic vindication of [their] constitutional right[s]," *Schneider v. County of San Diego,* 285 F.3d 784, 794 (9th Cir.2002) (quoting *Floyd v. Laws,* 929 F.2d 1390, 1403 (9th Cir.1991)). Given the range of available remedies, redressability is easily satisfied.

*Hassan*, 804 F.3d at 293-94.  Here, a judgment that Executive Order 2-21 violates that law and cannot stand will redress Plaintiffs' injury.

### 4.  Plaintiffs Have Standing and Established a Justiciable Case or Controversy

All of the Plaintiffs possess standing to bring this matter in this Court.  The Defendants have, through Executive Order 2-21, made an invidious classification by national origin or ethnicity, which works harm upon each of them sufficient for an injury in fact, traceable to Defendants, which can be redressed through this suit.

### a.   The 1492 Society and COPOMIAO

"There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth v. Seldin*, 422 U.S. 490, 511 (1975).  It is obvious that The 1492 Society and COPOMIAO possess standing here.

Counts I, II, and III each directly address the Defendants' discriminatory conduct that has resulted in the unequal treatment of The 1492 Society's interests and the interests of its members. Ex. A ¶¶ 83-119. Specifically, Mayor Kenney has enacted Executive Order 2-21 that effectively repeals Columbus Day, a holiday that recognizes and shows appreciation for this Nation's Italian Americans, and replaces it with Indigenous Peoples' Day, a different holiday that recognizes and shows appreciation for this Nation's Indigenous People.  Ex. A ¶¶ 2, 4, 33, 121, 127. This act discriminates against Italian Americans, and organizations advocating for Italian American celebrations such as the Columbus Day parade, by exalting another ethnic group in their place. *Id.* at ¶¶ 4, 90 ("Mayor Kenney's Executive Order discriminates against Italian Americans by repealing a holiday that recognizes their ethnicity while simultaneously awarding a new holiday, on that same day, to a different but similarly situated group.").

The issuance of Executive Order 2-21 provides standing for The 1492 Society to institute the first three counts because its activities, as host of the Columbus Day parade, have been impaired by the actions of the Defendants through the withdrawal of official recognition and support (Ex. A at Ex. X thereto); and its members have been treated unequally under the law by having a holiday that recognizes their heritage and ancestry stripped as a City holiday and replaced with a holiday dedicated to a different ethnic group. *Id.* ¶¶ 2, 4, 90-91, 121.  Unequal treatment is a judicially cognizable personal injury that qualifies for standing purposes. *See*

13

*Hassan*, 804 F.3d at 289-90 ("Unequal treatment is a type of personal injury that has long been recognized as judicially cognizable . . . and thus qualifies as an actual injury for standing purposes"); *see also Evancho*, 237 F. Supp. 3d at 294 n. 44 ("Courts have long recognized . . . that a bare equal protection violation is sufficient to constitute an injury in fact for the purposes of establishing Article III standing . . ."). Defendants did not attempt to recognize both ethnicities on the Second Monday in October, but rather swapped a holiday dedicated to Italian Americans in exchange for a holiday dedicated to Indigenous People. Compl. ¶¶ 2, 4, 33, 121, 127. Clearly, this unequal treatment is fairly traceable to the challenged action, Executive Order 2-21. *Hassan*, 804 F.3d at 292. Finally, the harm to The 1492 Society can be redressed by the relief requested in Counts I, II, and III, by recognition of its rights and restoration of Columbus Day. *Id.* at 293-94 ("For other plaintiffs, the major purpose of the suit may be to obtain a public declaration that the[y are] right and w[ere] improperly treated . . . along with nominal damages that serve as a symbolic vindication of [their] constitutional right[s] . . . Given the range of available remedies, redressability is easily satisfied.") (internal citations and quotation marks omitted).

The 1492 Society also has standing to bring Counts IV, V, VI and VII on behalf of itself; all counts that concern Defendants' violation of the Constitution of Pennsylvania, state statutes and the Philadelphia Home Rule Charter. Ex. A (Compl.) ¶¶ 120-89. These doctrines mandate that Defendants not subsume the legislative function of City Council (Pa. Const. art. IX, § 2; 53 P.S. § 12127(a); Phila. Home Rule Charter § 1-101) and not take any action "contrary to, or in limitation or enlargement of," statutes enacted by the General Assembly "which are . . . [a]pplicable in every part of the Commonwealth" (44 P.S. § 32; 44 P.S. § 11). Ex. A at ¶¶ 171-89. Defendants' violation of these doctrines directly harms The 1492 Society. *Id.* at ¶ 17.

The 1492 Society is a Philadelphia-based non-profit that is "the host of the annual Philadelphia Columbus Day Parade." *Id.* ¶ 138. The 1492 Society's "purpose is to promote Italian culture and traditions by sponsoring the annual Philadelphia Columbus Day Parade and Festival . . . [by] organiz[ing] Philadelphia's annual Columbus celebration and Columbus Day parade which celebrates Italian American heritage." *Id.* at ¶ 17. When Defendants illegally repealed Columbus Day by mayor fiat, The 1492 Society was directly harmed given that the City in which it operates no longer recognizes the holiday through which it "promote[s] Italian culture and traditions[,]" including the parade and festival. *Id.* The 1492 Society's interest in this matter is more than that of general members of the public. *Hassan*, 804 F.3d at 291. Rather, The 1492 Society's entire purpose is dedicated to recognizing Italian American heritage through Philadelphia's Columbus Day. Ex. A ¶ 17.

Moreover, The 1492 Society benefits each year when City Council designates it as the host of the annual Philadelphia Columbus Day Parade. Ex. A ¶ 138. Now, Executive Order 2-21 has repealed Columbus Day as a City recognized holiday. *Id.* at ¶¶ 2-7, 47-48.  The act of repealing an officially recognized holiday for which an organization exists harms its purpose, confers it standing to challenge that executive action which repeals the holiday in violation of the Separation of Powers, Sunshine Act, the Philadelphia Home Rule Charter and multiple state statutes that mandate Defendants recognize Columbus Day (Counts IV-VII). *Id.* at ¶¶ 17, 120-89.

Executive Order 2-21 also attempts to illegally supersede state law and repeal Columbus Day as a holiday for the citizens of Philadelphia. Ex. A ¶¶ 171-189.  These acts in violation of the Pennsylvania Constitution, state law and the Philadelphia Home Rule Charter directly injures The 1492 Society's purpose and ability to be designated as the host of Philadelphia's Columbus Day parade. *Id.* ¶¶ 136-38 ("The Resolution also recognizes The 1492 Society as the host of the

annual Philadelphia Columbus Day Parade."). The 1492 Society is directly harmed by Defendants' conduct because it has annually been tasked with sponsoring "Philadelphia Columbus Day" to "promote Italian culture and traditions" *Id.* ¶¶ 17, 141. When Defendants abolished Philadelphia's Columbus Day, the 1492 Society was harmed because its very purpose is to promote "Italian American heritage" on that City designated holiday. *Id.* ¶ 17.

Similarly, COPOMIAO has standing to institute all Counts. COPOMIAO is a coalition organization that consists of the individual members of forty-six (46) smaller organizations and their respective Presidents. Ex. A ¶ 15 ("consists of member Presidents of forty-six (46) different organizations and their individual members"). Given the sheer size of COPOMIAO, it is no surprise that more than one thousand (1,000) of its individual members are Italian Americans that reside in the City of Philadelphia. *Id.* Each of these individuals have standing to institute the instant lawsuit in their own capacity but have elected for COPOMIAO to represent their collective interests.

> Even in the absence of injury to itself, an association may have standing solely as the representative of its members. . . . The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. . . . So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.

*Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)) (internal quotation marks omitted.)

All that is required to establish COPOMIAO's standing is a showing that a single member is suffering immediate or threatened injury as a result of the challenged action, of the

sort that would make out a justifiable case had the member itself brought the suit. *Id.* In this action, COPOMIAO has standing to represent its Italian American members as to each Count pled in the Complaint.  Counts I, II, and III each directly address the Defendants' discriminatory conduct that has resulted in the unequal treatment of COPOMIAO's individual Italian American members.  Ex. A ¶¶ 83-189. Specifically, Mayor Kenney has enacted Executive Order 2-21 that effectively repeals Columbus Day, a holiday that recognizes and shows appreciation for this Nation's Italian Americans, and replaces it with Indigenous Peoples' Day, a *different* holiday that recognizes and shows appreciation for this Nation's Indigenous People. Compl. ¶¶ 2, 4, 33, 121, 127. This act discriminates against Italian Americans by exalting another ethnic group in their place. *Id.* at ¶¶ 2, 4, 90-91, 121 ("Mayor Kenney's Executive Order discriminates against Italian Americans by repealing a holiday that recognizes their ethnicity while simultaneously awarding a new holiday, on that same day, to a different but similarly situated group.").

As set forth *supra*, unequal treatment is a judicially cognizable personal injury that qualifies for standing purposes.  *Hassan*, 804 F.3d at 289-90; *Evancho*, 237 F. Supp. 3d at 294 n. 44.  Defendants did not attempt to recognize both ethnicities on the Second Monday in October, but rather swapped a holiday dedicated to Italian Americans in exchange for a holiday dedicated to Indigenous People. Compl. ¶¶ 2, 4, 33, 121, 127. Clearly, this unequal treatment is fairly traceable to the challenged action, Executive Order 2-21. *Hassan*, 804 F.3d at 292. COPOMIAO's members' injury is easily redressed by voiding Executive Order 2-21. *Id.* at 293-94.

COPOMIAO has standing to bring Counts IV, V, VI[4] and VII against Defendants. Each of these Counts concern either a violation of municipal or state law that govern Defendants'

---

[4] *See* 65 Pa. C.S. § 715 ("the action may be brought by any person where the agency whose act is complained of is located or where the act complained of occurred."); *Sterner v. Twp. of Tunkhannock*, No. CIV.A. 3:CV-04-2636,

conduct with respect to repealing one City holiday and replacing it with a new holiday. Ex. A ¶¶ 120-189. As previously noted, COPOMIAO may represent any member that has standing to sue in their own capacity. *Hunt*, 432 U.S. at 342-43. First, the individual member must have suffered an injury in fact – "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical[.]" *Lujan*, 504 U.S. at 560. "It is an established principle . . . that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained or is immediately in danger of sustaining a direct injury as the result of that action and it is not sufficient that he has merely a general interest common to all members of the public." *Ex parte Lévitt,* 302 U.S. 633, 634 (1937).

As to Counts IV-VII, the injury in fact requirement is comfortably established because Defendants have promulgated discriminatory legislation that repeals a holiday designated to in honor of Italian Americans and replaces it with a holiday designated to a different ethnic group. Ex. A ¶¶ 3-4, 7, 127, 145, 156, 160.  In issuing the discriminatory Executive Order, Defendants ignored the Philadelphia Home Rule Charter which mandates that any changes to City holidays first be submitted to the Civil Service Commission and Administrative Board and failed to afford the public an opportunity for public notice and inspection. *Id.* ¶¶ 121-27. Defendants further violated the Separation of Powers that the Pennsylvania Constitution, Philadelphia Home Rule Charter and state law mandate to avoid the very dictatorial governance that is on display in Executive Order 2-21. *Id.* at ¶¶ 130-52. Executive Order 2-21 also attempts to supersede state law. *Id.* at ¶¶ 5, 178-89.

---

2006 WL 1004829 (M.D. Pa. Apr. 18, 2006) (citing *United Mine Workers v. Gibbs,* 383 U.S. 715 (1966)) ("If the Court finds that Plaintiff's federal claim (Count Two) against the Defendant Township should be allowed to proceed, this Court will exercise jurisdiction over Plaintiff's pendent state claim under the Pennsylvania Sunshine Act contained in Count Three of her Complaint.").

Defendants' violation of multiple provisions of local and state law have resulted in COPOMIAO's Philadelphia Italian American members sustaining a direct injury, by way of discrimination and unequal treatment, that has caused the only holiday dedicated to their heritage and ancestry to be repealed and replaced. *Id.* at ¶ 121. Clearly, this is not an injury of "general interest common to all members of the public," but rather a concrete and particularized injury that directly impacts Philadelphia's Italian Americans. *Ex parte Lévitt,* 302 U.S. 633 at 634; *see also Hassan*, 804 F.3d at 293 ("[D]iscrimination itself is [a] legally cognizable injury.").

Accordingly, standing is appropriately afforded to The 1492 Society and COPOMIAO because its individual Italian American members have been harmed by the discriminatory Executive Order.

### b.      Jody Della Barba Has Standing

Jody Della Barba has standing to bring her claims in this matter.  She, as a private individual in respect to all counts in the Complaint, demonstrates that she "has sustained or is immediately in danger of sustaining a direct injury as the result of that action . . ." *Ex parte Lévitt,* 302 U.S. 633, 634 (1937).  Additionally, she possesses indisputable standing under the Sunshine Act.  65 Pa. C.S. § 715.

Jody Della Barba has standing to institute all Counts for the same reasons COPOMIAO's individual members have standing. Ms. Della Barba is an Italian American resident of Philadelphia who has been discriminated against by Mayor Kenney's Executive Order 2-21. Ex. A ¶ 18. She is also the Parade Organizer and Secretary of The 1492 Society, and as such has a personal interest in Executive Order 2-21's cancellation of the holiday upon which the annual parade she runs depends.  *Id.* at ¶¶ 17-18. The act of taking a holiday prescribed to one ethnic

group and exalting another in its place is discriminatory and in violation of the Equal Protection Clause. *Id.* at ¶¶ 2, 4, 47-48, 90-91, 121.

Ms. Della Barba has suffered an injury in fact because "discrimination itself is the legally cognizable injury." *Hassan*, 804 F.3d at 293. When Defendants entered Executive Order 2-21 it discriminated against "Italian Americans to exalt another ethnic group in its place." Ex. A ¶ 4; *see Sandberg,* 111 F.3d at 335 ("The fundamental concern of discrimination law is to redress the dignitary affront that decisions based on group characteristics represent, not to guarantee specific economic expectancies.").

Additionally, to institute the discriminatory Executive Order, Defendants not only violated the Equal Protection Clause, they further infringed upon the Philadelphia Home Rule Charter, Separation of Powers, Sunshine Act, and multiple state statutes (Counts IV-VII). The Sunshine Act provides an individual right to sue, and therefore standing, to Ms. Della Barba as a Philadelphia resident. 65 Pa. C.S. § 715 ("The action may be brought by any person where the agency whose act is complained of is located or where the act complained of occurred."). Since she has been discriminated against and suffered harm cognizable under state laws, Ms. Della Barba has standing to institute an equal protection claim and challenge the violations of municipal and state law that have led to her harm.

Because Ms. Della Barba is a member of the ethnic group subject to the unconstitutional discrimination, she is unquestionably "affect[ed] . . . in a personal and individual way." *Lujan,* 504 U.S. at 560 n. 1. Her claims are directly traceable to the challenged action because it is Executive Order 2-21 that discriminates against Italian Americans and confers a benefit upon Indigenous People. *Id.* Her harm is redressed if Executive Order 2-21 is voided. Accordingly, Ms. Della Barba also has standing to institute all counts pled in the Complaint.

c.    **Councilmember Mark Squilla Has Standing.**

Councilmember Mark Squilla has standing to bring each and every Count in his official and/or personal capacity. As a member of City Council, not only has Mark Squilla taken an oath to support the Constitution of the United States, the Commonwealth of Pennsylvania, and the Philadelphia Home Rule Charter,[5] but he has been deprived of his right and role to have the business and affairs of the City of Philadelphia submitted to City Council by the Mayor;[6] and as an Italian American, he has suffered from the invidious classification present in Executive Order 2-21.  Finally, as a Philadelphia resident, Councilman Squilla possesses indisputable standing under the Sunshine Act.  65 Pa. C.S. § 715.

Councilmember Squilla has standing to bring all counts of the Complaint for essentially the same reasons as Jody Della Barba, as an Italian American and Philadelphia resident in the same capacity. Councilmember Squilla has been subject to discrimination by Defendants on the basis of ethnicity when Defendants repealed Columbus Day and replaced it with a new holiday, designated to a different ethnic group.  Ex. A ¶¶ 2, 4, 47-48 ("Mayor Kenney and the City are thus explicitly choosing which ethnicities should be credited, supported, and approved by the City government, and which ethnicities should be shamed, disdained and canceled."). Unequal treatment is a type of injury that is judicially cognizable. *See Hassan*, 804 F.3d at 293 ("[D]iscrimination itself is the legally cognizable injury."). The challenged action – Executive Order 2-21 – is fairly traceable to Mark Squilla's injury-in-fact considering the harm can be swiftly redressed if Executive Order 2-21 is voided.   *Id.* at 292-93.  Furthermore, a favorable ruling will result in a public declaration that Philadelphia's Italian Americans were improperly

---

[5] *See* Phila. Home Rule Charter § 8-300 ("All persons elected, appointed or employed under the provisions of this charter, . . . shall, before entering upon the duties of their offices or employments, take an oath of office to support the Constitutions of the United States and of the Commonwealth of Pennsylvania and this charter.").
[6] 53 P.S. § 12127(a).

treated and serve as a vindication of Italian Americans' constitutional rights and protection. *Hassan*, 804 F.3d at 293-94.

Councilmember Squilla has standing to institute Counts IV, VI[7] and VII in his personal and official capacity. Like the individual members of COPOMIAO and Jody Della Barba, Councilmember Squilla has been injured as a Philadelphia Italian American by way of the enactment of Executive Order 2-21 that discriminates against Italian Americans by repealing Columbus Day and replacing it with a holiday designated to a similarly situated group. Ex. A ¶¶ 2, 4, 47-48, 121, 127, 145. Discrimination is not an injury of "general interest common to all members of the public," but rather a concrete and particularized injury that directly impacts Philadelphia Italian American Mark Squilla. *Ex parte Lévitt,* 302 U.S. 633 at 634; *Hassan*, 804 F.3d at 291.  Accordingly, Councilmember Squilla can challenge this executive action through Counts IV, VI and VII, that concern violations of local and state law, in his personal capacity on the basis that Defendants' violations of these statutes have resulted in unequal treatment that discriminates against Italian Americans. *Id.*   In particular, Councilman Squilla has unquestionable standing under the Sunshine Act. 65 Pa. C.S. § 715 ("The action may be brought by any person where the agency whose act is complained of is located or where the act complained of occurred.").

With respect to Counts IV, V, VI, and VII, Councilman Squilla's legislative role as a City Councilman was impaired, impeded, and negated by Executive Order 2-21.  In *Dennis v. Luis*, the Third Circuit Court of Appeals recognized standing by legislators where the governor had

---

[7] *See* 65 Pa. C.S. § 715 ("the action may be brought by any person where the agency whose act is complaint of is located or where the act complained of occurred."); *Sterner v. Twp. of Tunkhannock*, No. CIV.A. 3:CV-04-2636, 2006 WL 1004829 (M.D. Pa. Apr. 18, 2006) (citing *United Mine Workers v. Gibbs,* 383 U.S. 715 (1966)) ("If the Court finds that Plaintiff's federal claim (Count Two) against the Defendant Township should be allowed to proceed, this Court will exercise jurisdiction over Plaintiff's pendent state claim under the Pennsylvania Sunshine Act contained in Count Three of her Complaint.").

made an appointment without the advice or consent of the legislature.  741 F.2d 628, 631 (3d Cir. 1984).  In *Dennis*, the Third Circuit held that the legislators' "unique statutory right to advise the Governor on executive appointments and to confer their approval or disapproval" provided "a personal and legally cognizable interest peculiar to the legislators" such that they had standing. This case is no different.

Executive Order 2-21 runs directly afoul of Councilman Squilla's role as a City Councilman.[8]  Under Pennsylvania law, "[i]t shall be the duty of the mayor: . . . To recommend, by message in writing to the council, ***all such measures connected with the affairs of the city*** and the protection and improvement of its government and finances as he shall deem expedient." 53 P.S. § 12127(a) (emphasis added).  The renaming of a city holiday specially recognized by City Council was unquestionably an issue that should have been submitted to City Council under this statute.  Similarly, Philadelphia's Home Rule Charter adopts the principle of separation of powers, which has been violated by the Mayor running roughshod over the act of the City Council in enacting Resolution No. 170872 and vitiating an act of City Council by executive fiat.

---

[8] Defendants argue that Plaintiffs' "representation of [Mark Squilla] is contrary to the Philadelphia Home Rule Charter which [Defendants allege] provides that legal representation of the City be authorized by the City Solicitor." (Defs.' Br. 12 n. 4.) Defendants further argue that "[n]o such authorization has been sought or granted," likely in anticipation of a rebuttal based on Section 2-105 of the Philadelphia Home Rule Charter that permits Mark Squilla to seek outside counsel in certain situations. *Id.* Section 2-105 of the Philadelphia Home Rule Charter states that "[i]n the event the Law Department declines to advise or render legal services to the Council in any matter . . . relating to the executive and administrative branch of the City government, the Council may employ and fix the compensation of counsel of its own selection to handle such matter[.]") Despite Defendants' counsel's averment to the opposite, the City Solicitor specifically declined to represent Mark Squilla in this matter in a May 4, 2021 communication. The May 4th letter stated: "The City Solicitor did not approve of your representation of Councilmember Squilla in his official capacity. Nor does she approve it now."

In response to the May 4, 2021 correspondence, Plaintiffs' counsel alerted Defendants' counsel that Section 2-105 of the Philadelphia Code permits Councilmember Squilla to be represented by outside counsel in this matter. To date, Defendants' have not challenged this point. Furthermore, Defendants' counsel is barred from representing Councilmember Squilla under Rule of Professional Conduct 1.7 because the City Solicitor "shall not represent a client if the representation involves a concurrent conflict of interest." The Law Department may not represent Councilmember Squilla given the pervasive conflict of interest the instant action places on the Law Department. Obviously, the Law Department cannot simultaneously defend Mayor Kenney's discriminatory Executive Order and challenge that same Order on behalf of a Councilmember.

Phila. Home Rule Charter § 1-101 ("legislative power of the City . . . shall be exclusively vested in . . . Council[.]").

These are injuries in fact for which Councilmember Squilla has standing, because under *Dennis*, his role as a City Councilman has been eviscerated.  741 F.2d at 631.  It is clear that City Council maintains jurisdiction over City holidays given their annual resolutions that recognize Philadelphia's Columbus Day as a tribute to Italian Americans. *See* Ex. A ¶¶ 136-37 ("Each year, Philadelphia City Council designate[s] the week encompassing the second Monday in October as 'Italian American Heritage Week . . . in celebration of the festivities commemorating Columbus' historic voyage to the New World. . . . The annual Philadelphia Columbus Day Parade began in South Philadelphia in 1957, and has since become one of the City's premier ethnic celebrations.").  By doing this, the City Council (and Councilman Squilla) were acting properly in carrying out the mandate of the General Assembly that "the people of the Commonwealth, the public schools and other education institutions and historical organizations" observe Columbus Day annually. 44 P.S. § 32; Ex. A ¶ 181. When the Defendants entered Executive Order 2-21, which repeals Columbus Day as a City holiday, such Order directly violated 44 P.S. § 32, (as well as 44 P.S. § 11), and did so without submitting the matter to the City Council. Executive Order 2-21 attempts to illegally supersede state law and repeal Columbus Day as a holiday for the citizens of Philadelphia, in contravention of the Pennsylvania Constitution, state law and the Philadelphia Home Rule Charter, all of which directly harms Councilmember Squilla who is charged with upholding and supporting these very doctrines. *See* Phila. Home Rule Charter § 8-300.

Although it is not a federal case, the matter of *Bill Green, et al. v. Mayor Michael A. Nutter, et al.*, Docket No. 4395 (Phila. Ct. Com. Pl. 2008) (attached hereto as Exhibit B), is

instructive. In that case, the Philadelphia Court of Common Pleas heard a matter where a few City Council members challenged Mayor Michael Nutter's unilateral decision to close eleven neighborhood branches of the Philadelphia Free Library without first consulting City Council. "The Mayor did not seek City Council approval to close the eleven branch libraries at issue." *Id.* In that action, the Defendants argued: "that City Council as a body should have brought this action; not just three members." *Id.* The Court found that individual members of City Council are permitted to petition the court for relief when their rights as councilmembers are violated by the mayor. *See id.* ("This court does not find Council as a body is required to request Peremptory Judgment.") The Court continued: "We are a government of 'checks and balances.' Even with a 'strong mayor' form of City government as set forth in the City Charter, City Council remains its legislative branch." *Id.* In conclusion, the Court found "that to close these capital facilities the Mayor is required to seek the approval of City Council." *Id*. As was the case in *Bill Green, et al. v. Mayor Michael A. Nutter, et al.*, No. 4395 (Phila. Ct. Com. Pl. 2008), a member of City Council has standing to challenge a mayor's conduct when his right to preside over the legislation of City affairs is violated.

Accordingly, Councilmember Squilla has standing both in his personal and official capacities against Defendants for violating the Separation of Powers this Commonwealth's Constitution and the City Charter requires.

### 5. The "Standing" Case Law Cited by Defendants is Inapposite

The case law cited by Defendants is factually and legally distinct, and simply not applicable to this action. Specifically, none of the cases cited by Defendants include an affirmative act by a government that results in the taking from one ethnic group and giving to

another at the former's expense. The authority cited by Defendants primarily concerns government messaging that occurred over the course of decades.

First, Defendants try to analogize this case to the Fifth Circuit decision in *Moore v. Bryant*. Referring to *Moore*, Defendants attempt to reach the faulty conclusion that there is no standing in this action because it concerns mere government messaging, not unequal treatment. 853 F.3d 245 (5th Cir. 2017). *Moore* should play no role in the standing question before this Court. In *Moore*, an African American Mississippi lawyer sued the Governor of Mississippi, alleging that the Mississippi flag violated his rights under the Equal Protection Clause of the Constitution. *Id.* at 247-49. Because he failed the standing requirements for Equal Protection, the plaintiff in *Moore* relied upon the standing requirements necessary for a claim under the Establishment Clause, _not_ the Equal Protection Clause. *See id.* at 250 ("Plaintiff argues that the test for Equal Protection Clause standing must mirror the test for Establishment Clause standing[.]"); *see id.* at 249-50 ("the Establishment Clause case law, though vital for its purpose and settled as doctrine, is inapplicable. In an Establishment Clause case, a plaintiff adequately alleges standing by alleging direct and unwelcome exposure to a religious display. . . . Indeed, other courts have rejected attempts to cross-pollinate Equal Protection Clause standing jurisprudence with Establishment Clause cases."). Plaintiffs in this action do not attempt to "cross-pollinate" Equal Protection standing with Establishment Clause standing. *Id.*

Further, unlike Plaintiffs here, for standing purposes, the plaintiff in *Moore* merely alleged he was "unavoidably exposed to the state flag and that flag's message is painful, threatening, and offensive to him, [and] makes him feel like a second-class citizen[.]" *Id.* at 249 (internal quotation marks omitted.) As stated in *Moore*, "to plead stigmatic-injury standing, [p]laintiff must plead that he was personally subjected to discriminatory treatment." *Id.* The

Court in *Moore* held that the plaintiff failed to plead discriminatory treatment, only government messaging that caused him mere "offense." *Id.* at 253.

But that is not the case here.  Plaintiffs herein allege discriminatory treatment, not merely harmful government messaging. Specifically, Plaintiffs allege that:

> Mayor Kenney's Executive Order discriminates against Italian Americans by repealing a holiday that recognizes their ethnicity while simultaneously awarding a new holiday, on that same day, to a different but similarly situated group. . . . While both groups' ethnicity deserve recognition, Mayor Kenney may not take action that discriminates against Italian Americans to exalt another ethnic group in its place. . . . Mayor Kenney's Executive Order, discriminating against one ethnic group in favor of another ethnic group, was issued without a compelling government interest and is not narrowly tailored to serve any government interest. . . . Mayor Kenney's Executive Order 2-21 has the effect of distributing burdens and benefits unequally between Italian Americans and the Indigenous Peoples by replacing a holiday meant to recognize the contributions and hardships of Italian Americans with a holiday that recognizes the contributions and hardships of the Indigenous Peoples.

Compl. ¶¶ 4, 90, 99.

The issuance of Executive Order 2-21, which acts to repeal the only holiday designated to Italian Americans' heritage and replaces it with a different holiday, designated to a different ethnic group, is discriminatory on its face and constitutes unequal treatment. *Id.* In *Moore*, the plaintiff's position is inapposite with this action – he only "argues that exposure to unavoidable and deleterious Government speech is sufficient to confer standing," and that the standing requirements for the Establishment Clause should be applied to Equal Protection matters. *Moore*, 853 F.3d at 249-50.   *Moore* should be disregarded because this action concerns a specific

27

Executive Order issued by a local government that constitutes discriminatory treatment that directly harms Plaintiffs, not merely offensive government speech.[9]

Defendants also rely on *Allen v. Wright*, an action brought by the parents of African American public-school children, alleging that the Internal Revenue Service "has not adopted sufficient standards and procedures to fulfill its obligation to deny tax-exempt status to racially discriminatory private schools." 468 U.S. 737, 739 (1984).  The court in *Allen* held that an injury for racial discrimination provides "standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct[.]" *Id.* at 755. The plaintiffs in *Allen* attempted to show standing by arguing that they were "harmed directly by the mere fact of Government financial aid [being given] to discriminatory private schools." *Id.* at 752. But unlike this case, the plaintiffs never alleged any injury that was actually suffered as a direct result of having personally been denied equal protection. *Id.* at 755. The court held that a stigmatizing "injury accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct, and respondents do not allege a stigmatic injury suffered as a direct result of having personally been denied equal treatment." *Id.* at 738. In other words, the plaintiffs in *Allen* never alleged a cognizable injury – they only alleged the government violated the law. *Id.* at 755 ("they do not allege a stigmatic injury suffered as a direct result of having personally been denied equal treatment.").

---

[9] To further support their faulty *Moore*-based argument, Defendants cite *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982). However, *Valley Forge Christian Coll.* is premised on an Establishment Clause claim, not an Equal Protection based claim as the instant action is. *See id.* at 487 ("Their claim that the Government has violated the Establishment Clause does not provide a special license to roam the country in search of governmental wrongdoing and to reveal their discoveries in federal court."). *Valley Forge Christian Coll.* simply has no bearing on Plaintiffs' claims based on the Equal Protection Clause.

Unlike *Allen*, Plaintiffs here have alleged they were personally damaged by the denial of equal treatment.  Plaintiffs allege that the cancelling of Columbus Day directly harmed their celebration of the Day through a festival and Parade that was tied to the Holiday in Philadelphia. Further, Plaintiffs allege "Mayor Kenney's Executive Order discriminates against Italian Americans by repealing a holiday that recognizes their ethnicity while simultaneously awarding a new holiday, on that same day, to a different but similarly situated group. . . . Mayor Kenney's Executive Order 2-21 has the effect of distributing burdens and benefits unequally between Italian Americans and the Indigenous Peoples by replacing a holiday meant to recognize the contributions and hardships of Italian Americans with a holiday that recognizes the contributions and hardships of the Indigenous Peoples. . . ." Ex. A ¶¶ 90, 99, 106. Plaintiffs have sufficiently alleged injury requisite to establish standing for an Equal Protection Claim based on discriminatory treatment. *Id.*

Lastly, Defendants cite the district court decision in *Harris v. United States*, but that case has no resemblance to the facts in this case.  The claim in *Harris* was brought by *pro se* plaintiffs who asked the court to compel Congress to declare a new holiday called "Emancipation Proclamation Day." 447 F. Supp. 2d 208, 209 (D. Conn. 2005). *Harris* has no bearing on the instant action because Plaintiffs are not asking the Court or Defendants to legislate a new holiday or undertake any other legislative function: this case is about Italian Americans, and Italian American organizations, asking that Columbus Day—an existing Italian American holiday—not be erased in favor of another ethnic group's holiday.

*Harris* is about a generalized grievance, where the plaintiffs lacked standing, because they sought to legislate through the Article III courts.  Here, Plaintiffs are alleging discriminatory treatment by way of the local government explicitly repealing a City recognized holiday that had

29

been designated to recognize Italian Americans and replaced with a new holiday, recognizing a different ethnic group. Ex. A ¶¶ 90, 99, 106.   This is specific and concrete harm that discriminates against Italian Americans and negatively impacts the Columbus Day parade, which previously was recognized by City Council.

All cases cited by Defendants are far amiss from the facts and law applicable to this action. In fact, not one case cited by Defendants concern an affirmative act, order or policy undertaken by a government that explicitly discriminates against and burdens one protected group – whether ethnic, racial, or otherwise – in favor of another similarly situated group. The issue of standing in this case is not even a close call. Defendants' Motion to Dismiss should be denied on this ground.

**B.  The "Government Speech Doctrine" Does Not Apply Here**

The City and Mayor Kenney rely on the "government speech" doctrine in an attempt to justify their discriminatory ***conduct,*** *to wit:*  an executive order replacing an Italian American holiday – Columbus Day – with another ethnicity's holiday, Indigenous People's Day.   This is an attempt to fit a square peg in a round hole.  The government speech doctrine does not apply in this case.  Plaintiffs here are not complaining about the government preventing Plaintiffs from expressing their views on public property.  Rather, Plaintiffs' claims are exclusively premised on the Mayor's conduct in issuing a discriminatory executive order that is ethnically based -- choosing to elevate one ethnic group (Indigenous People) over another ethnic group (Italian Americans).  The so-called government speech doctrine does not reach so far to protect such invidious discriminatory government conduct seeking to treat citizens differently based on the classification of race or ethnicity.

The "government speech" doctrine has never been held to apply as a bar to an equal protection claim that is based on government action that intentionally discriminates based on ethnicity.   Defendants, of course, fail to cite any such case.   Defendants rely principally on the Supreme Court's 2009 decision in *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) (monuments in public parks), the Sixth Circuit's decision in *Freedom from Religion Found., Inc. v. City of Warren, Mich.*, 707 F.3d 686 (6th Cir. 2013)(government Christmas holiday display), and the Third Circuit's decision in *Fields v. Speaker of Pennsylvania House of Representatives*, 936 F.3d 142 (3d Cir. 2019)(legislative prayer in state capitol building).   These cases simply do not apply here.   In each of these cases, the plaintiffs sought to force the government to express the plaintiffs' viewpoint in a finite space on government property, whereas here, Plaintiffs seek to prevent discriminatory government conduct based on ethnicity in violation of the equal protection clause.

In its "recently minted" government speech doctrine, the Supreme Court of the United States in *Pleasant Grove City v. Summum* interpreted the First Amendment to include a "government speech" defense to free speech claims by private parties.   *Summum*, 555 U.S. at 481 (2009)(Stevens, J., concurring)(referring to "recently minted government speech doctrine.")  In *Summum*, the Court addressed a first amendment claim brought by a religious organization against a municipality.   The claim was premised on the municipality refusing to display the religious organization's chosen monument in a public park alongside other government chosen monuments.   The Court framed the question narrowly:  "whether the Free Speech Clause of the First Amendment entitles a private group to insist that a municipality permit it to place a permanent monument in a city park in which other donated monuments were previously erected."  *Id.* at 464.   The Court found that "[p]ermanent monuments displayed on public property typically

31

represent government speech," *id.* at 470, and therefore, the government's decision not to display

the religious organization's monument could not form the basis of a free speech claim because it

involved an attempt to control the government's speech in selecting which monuments to display

in a limited space.

Importantly, the Court in *Summum* did not conclude that, under the government speech

doctrine, government conduct purposely selecting one ethnic group over another ethnicity would

be immune from constitutional scrutiny.  Indeed, this point was made clear by Justice Stevens'

concurring opinion, joined by the late Justice Ginsburg, noting that "government speakers are

bound by the Constitution's other proscriptions, including those supplied by the Establishment

and Equal Protection clauses."  *Id.* at 482.  Further, in his concurring Opinion, Justice Breyer

cautioned against a categorical or rigid "government speech" doctrine, urging "we would do well

for us to go slow in setting its bounds."  *Id*. at 484-85 (Breyer, J., concurring)(". . . 'government

speech' doctrine is a rule of thumb, not a rigid category.  Were Pleasant Grove City (City) to

discriminate in selection of permanent monuments on grounds unrelated to the display's theme,

say, solely on political grounds, its action might well violate the First Amendment.  In my view

courts must apply categories such as 'government speech,' . . . with an eye toward their purposes,

lest we turn 'free speech' doctrine into a jurisprudence of labels.")

Four years later, the Sixth Circuit decided *Freedom from Religion Found., Inc. v. City of

Warren, Mich.*, 707 F.3d 686 (6th Cir. 2013), which involved a private group challenging a

municipalities' refusal to include an anti-religious "Winter Solstice" sign as part of a Christmas

holiday display located on government property.  Relying on the government speech doctrine

from *Summum*, the Sixth Circuit held that the group could not compel the municipality to include

its sign since the government had the right to express its Christmas holiday viewpoints and could

not be compelled to include all other potential viewpoints.  Again, it is important to note that the Sixth Circuit did not expand the government speech doctrine to protect the government from claims of invidious discrimination based on race or ethnicity simply because government speech maybe involved in some way.  Rather, the doctrine is invoked to resolve a unique government problem when it comes to private speaker's access to government property:  avoiding the requirement of forcing government to "accommodate[e] all or even most requests in a finite space." *Id.*  at 698.

The Third Circuit in *Fields*, decided ten years after *Summum*, addressed the government speech doctrine in the context of "legislative prayer," where a group of anti-theists sought to compel the Pennsylvania legislature to include anti-theist guest chaplains to read the opening prayer for legislative sessions.  In that specific factual context, where a group sought to force the government to give them access to a "finite" government space on government property to express themselves, the Third Circuit, following *Summum*, found the government speech doctrine foreclosed relief under the First Amendment and Equal Protection grounds.[10]  But, again, *Fields* did not address the specific legal question presented by the facts in this case: whether the government speech doctrine would protect government actors who discriminate by choosing to elevate one ethnic group over another ethnic group.

Indeed, Defendants cannot cite to a single court decision that applied the government speech doctrine to the same or similar government conduct that is at issue here.  Not surprisingly,

---

[10]      Although the court in *Fields* determined the government speech doctrine applied to bar relief under the Equal Protection Clause, it noted there was a split in authority on whether the doctrine applied to equal protection claims.  *Fields*, 936 F.3d at 160-61 (acknowledging the First and D.C. Circuits, and Justice Stevens in his concurrence in *Summum*, have suggested "that the Equal Protection Clause might apply to government speech.")(citing *Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 331 n. 9 (1st Cir. 2009); *People for Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005)).  That distinction, Plaintiffs submit, is not relevant for purposes of this case because, as argued herein, the government speech doctrine does not apply to the conduct of the Defendants here.  The doctrine cannot be used to immunize conduct of government officials that act to discriminate against groups based on ethnic or racial classifications.

when the Supreme Court has confronted similar government conduct involving the government making ethnic or racially based public statements that sought to make classifications along such lines, it has not been hampered by arguments about "government speech."

For example, in *Lombard v. Louisiana*, the Supreme Court held that city officials' speech commanding continued segregation by private restaurants was a violation of the Equal Protection Clause.  373 U.S. 267 (1963).  In *Lombard*, the Mayor of New Orleans publicly spoke out against "sit-in demonstrations" by civil rights activists, who refused to leave lunch counters after restaurant owners demanded they do so.  Although the City did not have ordinances requiring segregation, the Mayor stated that such "sit-in demonstrations" would not be permitted.  In an official statement published in the city newspaper, the Mayor specifically stated that:

> I have today directed the superintendent of police that no
> additional sit-in demonstrations . . . will be permitted . . .
> regardless of the avowed purpose or intent of the participants.  It is
> my determination that the community interest, the public safety,
> and the economic welfare of this city require that such
> demonstrations cease, and that henceforth they be prohibited by the
> police department.

*Id.* at 272.  The Court, interpreting the Mayor's statements, concluded:  "as we interpret the New Orleans city officials' statements, they here determined that the city would not permit Negroes to seek desegregated service in restaurants." *Id.*  Accordingly, the Court concluded the Mayor's public proclamation constituted state action in violation of the Equal Protection Clause.  *Id.* at 273.  Notably (and thankfully), the Court was not concerned with the fact that the Mayor had expressed his views on the matter in a public statement.  Nor was there a concern that "government speech" somehow precluded a finding that an equal protection violation was afoot.

Likewise, in *Anderson v. Martin*, the Supreme Court struck down, on equal protection grounds, a state law requiring that political candidates be identified by race on all ballots and

nominating papers.  The state sought to justify the law on the grounds that the state was merely

enforcing its right to inform the electorate about candidates for public office.  It was, in essence,

a "government speech" type defense.  But the Court, recognizing the danger of government

speech creating classifications along race or ethnic lines, found this type of government conduct

caused constitutionally cognizable harm and struck down the law on equal protection grounds:

> [T]his case . . . has nothing . . . to do with the right of a citizen . . .
> to receive all information concerning a candidate which is
> necessary to a proper exercise of his franchise.  It has to do only
> with the right of a State to require or encourage its voters to
> discriminate upon the grounds of race . . . [B]y placing a racial
> label on a candidate at the most crucial state in the electoral
> process – the instant before the vote is cast – the State furnishes a
> vehicle by which racial prejudice may be so aroused as to operate
> against one group because of race and for another.

375 U.S. 399, 401-02 (1964).

The Supreme Court has consistently found government conduct like that at issue here,

where the government seeks to treat citizens differently based on the classification of race or

ethnicity, to be constitutionally abhorrent.  And, while these cases may at some level involved a

form of government speech expressing views on policy, the Supreme Court was not deterred

from finding an equal protection violation.  *See, e.g,  Gratz v. Bollinger*, 539 U.S. 244

(2003) (invalidating university undergraduate admissions policy seeking to enroll

underrepresented minority students); *Rice v. Cayetano*, 528 U.S. 495 (2000)(invalidating

provision of Hawaii Constitution restricting right to vote in statewide elections to Hawaiians and

native Hawaiians, each statutorily defined on the basis of ancestry as racial

discrimination); *Palmore v. Sidoti*, 466 U.S. 429 (1984)(judicial decision considering race of

stepfather in custody invalid); *Koremastsu v. U.S.*, 323 U.S. 214 (1944)(endangered national

security exception, sustaining Japanese exclusion from civilian wartime military area), *abrogated*

by, *Trump v. Hawaii*, 138 S. Ct. 2392 (2018)(forcible relocation of U.S. citizens to concentration camps, solely and explicitly on basis of race, is objectively unlawful and outside the scope of Presidential authority).

Here, Plaintiffs submit that it is extremely troubling that the Mayor would invoke the "government speech" doctrine as a way to justify his ethnically discriminatory executive order, which, as alleged in the Complaint has both a discriminatory purpose and effect.  As the Supreme Court has consistently held, no public official or state actor as the right to make such ethnically based classifications.  The narrow "government speech" doctrine was not meant to be applied in such a way to sanction government conduct that expressly discriminates based on ethnicity.  To the extent the Mayor believes he has the right to engage in such conduct under the "government speech" doctrine, the Court, through this case, must disabuse him of such an unconstitutional notion.

## C.  Defendants Have Violated the Equal Protection Clause With an Invidious Classification by Ethnicity or National Origin that Burdens Plaintiffs' Rights

According to the Supreme Court of the United States, the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne  v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  The Defendants have violated this Constitutional requirement in making an invidious classification based upon national origin (or ethnicity) in the removal of Columbus Day and its replacement with Indigenous Peoples' Day.  Executive Order 2-21 is subject to strict scrutiny, and it plainly fails that scrutiny and thus violates Plaintiffs' rights.

Defendants make two arguments in their Rule 12(b)(6) motion on Counts I through III of the Complaint.  First, they argue that Plaintiffs have not met the prima facie elements of an equal protection claim.  Second, Defendants argue that Executive Order 2-21's outright and facial

statement favoring a national origin (or ethnicity) over others, in declaring that Columbus Day is now Indigenous Peoples' Day, is somehow only subject to rational basis scrutiny instead of the proper test, strict scrutiny.  Both of Defendants' arguments fail.

### 1.      Plaintiffs Set Forth a Prime Facie Case

Making broad generalizations and ignoring the facts pled in the Complaint, Defendants attempt to sweep away the Equal Protection Clause claims at issue in this case.  They attempt to insert their own facts without having any discovery or expert witness testimony on, claiming that Columbus Day has changed into something else, and that Plaintiffs can only complain of an employment benefit or a "dignity benefit," where in fact Plaintiffs' harms are concrete and Constitutional in scope.  Plaintiffs utilize Columbus Day to engage in the protected First Amendment activity of a Columbus Day parade, an event previously blessed by the City and now imperiled by the Defendants' attempt to wipe Columbus Day from the calendar.

Plaintiffs easily set forth prima facie equal protection claims in the Complaint.  To make such a claim, "a plaintiff must show that (1) compared with others similarly situated he was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion..."  *Cash v. Wetzel*, 8 F. Supp. 3d 644, 664 (E.D. Pa. 2014).[11]

---

[11] Defendants assert a different test, found in *Green v. Chester Upland Sch. Dist.*, 89 F. Supp. 3d 682, 693 (E.D. Pa. 2015).  To the extent that Plaintiffs must satisfy the element that they are members of a protected class, Plaintiffs are all Italian Americans, or Italian American organizations, and are thus members of a protected class. *See, e.g.*, *Covello v. City of Chicago*, 448 F. Supp. 2d 987, 993 (N.D. Ill. 2006); *DiCroce v. Kempthorne*, No. 06-5173, 2008 WL 2517175, at *4 (E.D. Pa. June 24, 2008).  The test as formulated in *Green* relies on distinguishing between protected and unprotected classes, however, and is thus distinguishable from the facts as set forth in this case, where the Defendants seek to place the needs and interests of one protected class over another without sufficient, or any, justification.

Plaintiffs were selectively treated in this instance, as is plain on the face of Executive

Order 2-21.  It states, in relevant part:[12]

> WHEREAS, the story of Christopher Columbus is deeply complicated. For centuries, he has been venerated with stories of his traversing the Atlantic and "discovering" the "New World". The true history of his conduct is, in fact, infamous. Mistakenly believing he had found a new route to India, Columbus enslaved indigenous people, and punished individuals who failed to meet his expected service through violence and, in some cases, murder;

> WHEREAS, over the last 40 years many states and cities have acknowledged this history by recognizing the holiday known as Columbus Day instead as Indigenous Peoples' Day. These jurisdictions include: Arizona, Michigan, Minnesota, North Carolina, Vermont, Virginia, Wisconsin and Washington, D.C.;

> WHEREAS, Black Lives Matter;

> NOW, THEREFORE, I, MAYOR JAMES F. KENNEY, Mayor of the City of Philadelphia, by the powers vested in me by the Philadelphia Home Rule Charter, do hereby ORDER as follows:

> **SECTION 1. DESIGNATION OF JUNETEENTH AS A CITY HOLIDAY**

> June 19 of every year is designated a holiday for all City employees and shall be treated as such in accordance with the applicable Civil Service regulations and Administrative Board rules.

> **SECTION 2. RENAMING OF HOLIDAY**

> The City holiday celebrated on the second Monday in October, formerly known as Columbus Day, shall now be designated as Indigenous Peoples' Day.

> **SECTION 3. DIRECTIVE TO CITY OFFICIALS**

> The Director of Finance, Chief Administrative Officer and Deputy Mayor for Labor are directed to make appropriate notifications to effectuate this Order.

---

[12] Plaintiffs make no claim objecting to the recognition of Juneteenth by the City of Philadelphia.

Ex. A at ex. A thereto (Executive Order 2-21) (emphasis in original).  Black residents, and in

particular descendants of those subject to the heinous practice of slavery, received the

designation of a new holiday in Executive Order 2-21; people of indigenous origin or descent

received recognition from the Defendants based on a newly named holiday "on the second

Monday in October;" Italian Americans, on the other hand, saw the Defendants wipe from the

calendar a holiday celebrating their national hero, Christopher Columbus, and a holiday which

was established to incorporate Italian Americans into American life: Columbus Day.  The order

itself establishes, even without the additional, amplifying statements by Defendant Kenney—

which add egregiousness to Executive Order 2-21 because of their diminishment of Italian

Americans— that Plaintiffs were members of a protected class, treated differently from others

similarly situated, for a reason based on national origin or ethnicity.  This is the very definition

of a prima facie equal protection case.

### 2. Strict Scrutiny Applies and Defendants Cannot Defend Executive Order 2-21

The Supreme Court has laid down, in no uncertain terms, the standard to be applied in

equal protection cases like this.  Where a statute (or Executive Order 2-21) falls under the

general rule, and implicates no automatically suspect categorization, "legislation is presumed to

be valid and will be sustained if the classification drawn by the statute is rationally related to a

legitimate state interest."  *City of Cleburne*, 473 U.S. at 440.  For example, in *City of Cleburne*,

the Supreme Court rejected any heightened equal protection scrutiny as it applied to individuals

with mental disabilities, because that classification was a natural classification for the state to

make in its regulatory acts.  *Id*. at 442-43.

Executive Order 2-21, however, makes a classification by national origin (or ethnicity)

directly on its face, striking Columbus Day from governmental recognition and substituting

Indigenous Peoples' Day.  Such government actions face a very different level of scrutiny under

the Equal Protection Clause:

> The general rule gives way, however, when a statute classifies by
> race, alienage, or national origin. These factors are so seldom
> relevant to the achievement of any legitimate state interest that
> laws grounded in such considerations are deemed to reflect
> prejudice and antipathy-a view that those in the burdened class are
> not as worthy or deserving as others. For these reasons and because
> such discrimination is unlikely to be soon rectified by legislative
> means, these laws are subjected to strict scrutiny and will be
> sustained only if they are suitably tailored to serve a compelling
> state interest.

*Id.* at 440.  The Supreme Court has swept aside, as invalid, many statutes that violate strict

scrutiny under the Equal Protection Clause, on the simple rationale that the language of the

statute benefitted or burdened a race, alienage, national origin, or ethnicity.  *See Graham v.*

*Richardson*, 403 U.S. 365, 374 (1971) (prohibiting residency and citizenship restrictions on

welfare benefits); *McLaughlin v. State of Fla.*, 379 U.S. 184 (1964) (invalidating statute making

racial categorization in cohabitation).  This case is, at its heart, no different: the Defendants must

face strict scrutiny—and fail to meet it—because they cannot establish a compelling state interest

in prioritizing Indigenous Peoples' Day over Columbus Day, because the distinction in

Executive Order 2-21 is made purely on the basis of national origin or ethnicity: indigenous

peoples receive a holiday, and Italian Americans lose a holiday.

The case cited by Defendants for the proposition that a holiday designation being outside

the realm of the Equal Protection Clause is a curious one.  In *Harris v. United States*, the

plaintiffs sought an order declaring a new federal holiday celebrating the Emancipation

Proclamation.  447 F. Supp. 2d 208, 209 (D. Conn. 2005).  Far from weighing in decisively for

the proposition asserted by the Defendants, the case turns on the fact that the plaintiffs alleged

only a generalized grievance and thus lacked standing: any discussion of the merits of the matter was *ultra vires*.

The remainder of Defendants' argument is a request that this Court, on the basis of a motion to dismiss before any discovery is taken, take judicial notice of facts Defendants have not properly presented with evidence and experts: the "historical reexamination of Christopher Columbus and his relationship to indigenous peoples[.]" Def. Mem. at 18. This is merely an attempt to relitigate standing as a merits issue, where it does not belong. The Plaintiffs include organizations and individuals that celebrate Columbus Day, and Italian American heritage, by holding a parade specific to Christopher Columbus and his Italian origins and that connection with the New World's discovery by Western Europeans; they are not mere bystanders in whether Columbus Day continues to be a recognized holiday in Philadelphia.

Finally, Executive Order 2-21 cannot even pass rational basis scrutiny, as the Defendants suggest. Even though the threshold for upholding a law based on rational basis scrutiny is low, and the test is only whether there exists "a rational relationship between the disparity of treatment and some legitimate governmental purpose," the Defendants cannot articulate the required legitimate government purpose for taking an Italian American holiday away and imposing Indigenous Peoples' Day in the place of Columbus Day. *Cabrera v. Attorney General*, 921 F.3d 401, 404 (3d Cir. 2019).

The sole attempt by the Defendants to argue a legitimate government purpose are, on page 19 of their Brief, "recognizing the different views of Columbus as a historical figure, the complicated history of the 'discovery' of America by Europeans, and the dignity of the indigenous people who inhabited this continent at that time[.]" None of these are rationally related to a legitimate government purpose of the City of Philadelphia. ***Nowhere*** in the Home

Rule Charter can be found Philadelphia's mission to provide scholarship on long-dead historical

figures; this is simply a fig-leaf for making a national origin and ethnicity classification by

creating Indigenous Peoples' Day.  And the second two supposedly legitimate purposes are

references back to ethnic groups or national origins—"Europeans" and "indigenous people"—

that merely re-emphasize the legal fact that this matter is one in which an invidious,

impermissible classification has been made, so abhorrent to the Equal Protection Clause that

strict scrutiny applies.

> For these reasons, the motion to dismiss should be denied.

**D.      Defendants Violated the Home Rule Act, and Count VII Cannot Be Dismissed**

> Contrary to the position of Kenney and the City, the City does not have unlimited

governing authority as if it were a sovereign.  Rather, the City only has as much authority as the

Pennsylvania General Assembly bestows upon it by way of an enabling statute.

> As a general matter, municipalities are creatures of the state and "possess only such

powers of government as are expressly granted to [them] and as are necessary to carry the same

into effect." *City of Philadelphia v. Schweiker*, 858 A.2d 75, 84 (Pa. 2004) (alteration in original)

*(quoting Appeal of Gagliardi*, 163 A.2d 418, 419 (Pa. 1960)).  A municipality is therefore

powerless to enact ordinances except as authorized by statute, and ordinances not in conformity

with the municipality's enabling statute will be void.  *See id.* (citing *Taylor v. Abernathy,* 222

A.2d 863, 865 (Pa. 1966)).

> Like the powers of other types of municipalities, the powers of a home rule municipality

are largely constitutionally and statutorily determined.  In that regard, the Pennsylvania

Constitution provides that "[m]unicipalities shall have the right and power to frame and adopt

home rule charters" and that pursuant to such charters, a home rule municipality "may exercise

any power or perform any function not denied by this Constitution, by its home rule charter or by

the General Assembly at any time." Pa. Const. art. IX, § 2.  Meanwhile, the Home Rule Act, 53

P.S. §§ 13101-13157, which is the enabling legislation for home rule by a first class city like

Philadelphia, provides that the City "shall have and may exercise all powers and authority of

local self-government and shall have complete powers of legislation and administration in

relation to its municipal functions ...," subject to certain enumerated limitations.  53 P.S. at §

13131.[13]  Among the limitations are that no city "shall exercise powers *contrary* to, or in

*limitation* or enlargement of, powers granted by acts of the General Assembly which are ...

[a]pplicable in every part of the Commonwealth."  53 P.S. § 13133(b) (emphasis added).

     Thus, under the Home Rule Act, the General Assembly gave Philadelphia "complete

powers of legislation and administration *in relation to its municipal functions,*" 53 P.S. § 13131

(emphasis added), but also prohibited it from "exercis[ing] powers *contrary to, or in limitation* or

enlargement of," statutes enacted by the General Assembly "which are [a]pplicable in every part

of the Commonwealth."  53 P.S. at § 13133 (emphasis added).  Executive Order 2-21 runs afoul

of this prohibition.

     Pennsylvania law states, in no uncertain terms, that the second Monday in October is

known as Columbus Day.  The Pennsylvania bank holiday statute states:

> The following days and half days, namely… ***the second Monday
> in October, known as Columbus Day***… shall, for all purposes
> whatever as regards the presenting for payment or acceptance, and
> as regards the protesting and giving notice of the dishonor of bills
> of exchange, checks, drafts, and promissory notes, made after the
> passage of this act, be treated and considered as the first day of the
> week, commonly called Sunday, and as public holidays and half
> holidays…

---

[13]    Philadelphia is the only first class city in Pennsylvania. It adopted its home rule charter
pursuant to the terms of the Home Rule Act on April 17, 1951.

44 Pa. Stat. Ann. § 11 (emphasis added).  Similarly, another section specifically recognizes

Columbus Day by name in its own statute:

> The Governor shall issue, annually, his Proclamation designating and ***setting apart October 12 as Columbus Day***, and calling upon the people of the Commonwealth, the public schools and other educational institutions and historical organizations to observe the discovery of the New World with appropriate exercises and programs, to the end that the discovery of America shall be commemorated each year.

44 Pa. Stat. Ann. § 32 (emphasis added).  The Legislature has spoken on this subject and

Philadelphia cannot alter these laws.

In direct contravention of these statutes, Executive Order 2-21 orders the following: "The

City holiday celebrated on the second Monday in October, formerly known as Columbus Day,

shall now be designated as Indigenous Peoples' Day."  Ex. A at ex. A thereto.  As 44 Pa. Stat.

Ann. § 11 and § 32 apply in every part of the Commonwealth, the Defendants cannot simply

paste an executive order over them.  53 P.S. at § 13133.  To the extent that Executive Order 2-21

attempts to change the name of Columbus Day, it cannot do so under the Home Rule Act, which

preempts Executive Order 2-21.

For these reasons, the motion to dismiss should be denied.

**E.    Defendants Violated the Home Rule Charter, the Separation of Powers, and the Sunshine Act, and Counts IV, V, and VI Cannot Be Dismissed**

Defendants seek to dismiss Counts IV through VI of the Complaint through assertions

that Plaintiffs—one of whom is a member of City Council—do not understand the City's

government.  This is belied by Defendants' own brief, in which they state in a footnote on their

single paragraph discussing Count VI:

> Placeholder to consider FN addressing that ***effectuating the Executive Order in its entirety includes amending the Civil Service Regulations to reflect the language designated by the City where it references City holidays*** (Reg 19) and that this process is

> underway. The amendment of those regulations, as Plaintiffs
> correctly note, will include notice and the opportunity for a hearing.
> But that is entirely separate from the Executive Order which is the
> subject of Plaintiffs' claims here.

Def. Mem. at 26 n.7 (emphasis added).  Defendants admit here that Executive Order 2-21, by its

own terms, not only implicates the Sunshine Act, but requires amendment of the Civil Service

Regulations.  When Kenney did "hereby ORDER… The City holiday celebrated on the second

Monday in October, formerly known as Columbus Day, shall now be designated as Indigenous

Peoples' Day[,]" he acted beyond his authority and powers, according to the Defendants' own

brief, and only after Plaintiffs have filed suit are Defendants scrambling to follow their own laws.

Ex. A at ex. A thereto.

Executive Order 2-21's own terms, in ordering that Columbus Day be eliminated and

Indigenous Peoples' Day established, was not a mere precatory directive, as Defendants appear

to argue.  It should be read and understood by its own language.  It changes the designation of

the second Monday in October, irrevocably, by its own terms.  Ex. A at ex. A thereto.  This

triggered the violations of the law underpinning Counts IV-IV.

Count IV must plainly survive the motion to dismiss, as Executive Order 2-21 is ***admitted***

to violate the procedures set forth in the Home Rule Charter.  Def. Mem. at 26 n.7.  The

Complaint sets forth the applicable Home Rule Charter provisions, and they could not be clearer.

Phila. Home Rule Charter § 7-400 requires that holidays be regulated by a process involving

submission "by the Personnel Director for approval to the Civil Service Commission and

Administrative Board" and then subject to public inspection and public notice.  Other officials

other than Kenney must approve holiday regulations.  *Id.* at Ann. 2.  The Administrative Board

must also act with respect to holiday regulations.  Phila. Home Rule Charter § 4-300.  The

Complaint notes, and Defendants do not have any basis to dispute, that Executive Order 2-21

was issued without following any of these provisions.  By its own terms, therefore, it was issued *ultra vires* and cannot do what it purports to do.

Count V, similarly, must survive.  Defendants adduce and cite to no authority supporting their contention that Kenney's abrogation of numerous acts of the City Council can go unchallenged.  As set forth in the Complaint and its attachments, Ex. A ¶¶ 129-41, the City Council has recognized and authorized Columbus Day.  In Resolution No. 170872, the City Council stated, "WHEREAS, The annual Philadelphia Columbus Day Parade began in South Philadelphia in 1957, and has since become one of the City's premier ethnic celebrations. On October 8, 2017, the 1492 Society will host the annual parade[,]" setting forth the historic basis for the Columbus Day parade in Philadelphia, and then, on that basis, issuing a legislative recognition of Columbus Day, as follows: "RESOLVED, BY THE COUNCIL OF THE CITY OF PHILADELPHIA, That we hereby designate the week of October 2 through October 9, 2017 as 'Italian American Heritage Week' and honor Connie Francis as Grand Marshall of the 2017 Columbus Day Parade."  Ex. A at ex. X thereto.  Executive Order 2-21 is a simple power grab by Defendants to wipe out Resolution No. 170872.  Defendants have no power to overturn an act of the City Council except by urging that City Council alter Resolution No. 170872: "The legislative power of the City … shall be exclusively vested in and exercised by a Council, subject only to the provisions of this charter."  Phila. Home Rule Charter § 1-101.[14]  *See also* Phila. Home Rule Charter § 1-102 ("The executive and administrative power of the City, as it now exists, shall be exclusively vested in and exercised by a Mayor and such other officers, departments, boards and commissions as are designated and authorized in this charter.").  Under

---

[14] This, combined with the separate executive role of the Mayor, establishes the separation of powers principle in Philadelphia. *City Council, City of Reading v. Eppihimer*, 835 A.2d 883, 893 (Pa. Commw. Ct. 2003) ("The requirement of a separation of powers in local government exists only if dictated by the state constitution, or if set forth in its charter.").

the Home Rule Charter, there is no basis for Executive Order 2-21 to rescind Resolution No. 170872.

Finally, Count VI of the Complaint, under the Sunshine Act, cannot be dismissed as no public process was followed to change regulations subject to public input and public hearings. "As a general rule, the Sunshine Act requires agencies to engage in 'deliberations' and to take 'official action' in meetings open to the public." *Dusman v. Bd. of Directors of Chambersburg Area Sch. Dist.*, 123 A.3d 354, 362 (Pa. Commw. Ct. 2015). Meetings from which the public is excluded are allowed in limited circumstances (employment, strategy, purchases, professional advice, privilege, academic issues, or public safety), but official action requires an open meeting. 65 Pa. Stat. and Cons. Stat. Ann. § 708. Defendants **admit**, Def. Mem. at 26 n.7, that they are only now beginning to comply with the Sunshine Act, and Executive Order 2-21 literally **orders** an official action in replacing Columbus Day with Indigenous Peoples' Day. Given these facts, Count VI, under the Sunshine Act, must plainly survive the motion to dismiss.

F.     **The High Public Official Immunity Doctrine Does Not Apply**

Curiously, the Defendants argue that "to the extent Plaintiffs' claims are based on Mayor Kenney's statements identified in the Complaint," he is entitled to "high public official immunity" under Pennsylvania state common law. This is a curious argument because it is well settled that the "high public official immunity" doctrine protects state public officials from damages arising from common law *tort* claims such as defamation, not, as asserted here, claims seeking declaratory and injunctive relief arising from constitutional claims under Section 1983 or violations of state statutes and local ordinances. *See, e.g., Judge v. Shikellamy School District*, 135 F.Supp. 3d 284, 302 (M.D. Pa. 2015) (noting "high public official immunity immunizes certain officials 'from all civil suits arising out of false defamatory statements,'" but not federal

constitutional claims under Section 1983) (citing *Kane v. Chester County Dept. of Children, Youth and Families*, 10 F.Supp. 3d 671, 697 (E.D. Pa. 2014) ("Under Pennsylvania law, 'high public officials' are absolutely immune from tort liability stemming from action taken with the scope of their authority.")

In *Judge v. Shikellamy School District*, the defendant public officials made a similar argument, seeking to dismiss constitutional claims under § 1983. But Judge Brann of the Middle District of Pennsylvania correctly rejected the argument:

> [t]his Court is unable to find a single case in which a Pennsylvania court has extended the doctrine to include either contract or constitutional claims. Importantly, it is clear to this Court that Defendants cannot utilize a state immunity such as the one at issue to insulate themselves from the application of a federal law under § 1983. The United States Supreme Court has explicitly stated that '[a]s to persons that Congress subjected to liability, individual states may not exempt such persons from federal liability in state court by relying on their own common-law heritage; to hold otherwise would enable states to nullify for their own people the legislative decisions that congress has made on behalf of all the people. [citations omitted]. For these reasons, the Court declines to extend the application of Pennsylvania's high public official immunity in the instant case to shield Defendants from liability for any alleged constitutional or contractual violations.

135 F.Supp. 3d at 302. This Court should do the same.

## CONCLUSION

Based on the forgoing, Defendants respectfully submit the Court should deny Defendants'

Motion to dismiss on all grounds.

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td></td><td>**BOCHETTO & LENTZ, P.C.**</td></tr>
</table>

Dated: May 26, 2021              By:

*/s/ George Bochetto*
_____
George Bochetto (27783)
David P. Heim (84323)
John A. O'Connell (205527)
Matthew Minsky (329262)
1524 Locust Street
Philadelphia, PA 19102
Telephone: (215) 735-3900
gbochetto@bochettoandlentz.com

*Attorney for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **CONFERENCE OF PRESIDENTS OF MAJOR ITALIAN AMERICAN ORGANIZATIONS, INC., et al.,** | : : : : : | **Civil Action** |
| **Plaintiffs,** | : : | **No. 2:21-cv-01609-CDJ** |
| **v.** | : : | |
| **CITY OF PHILADELPHIA, et al.,** | : : | |
| **Defendants.** | : : : : | |

<u>**CERTIFICATE OF SERVICE**</u>

I, George Bochetto, Esquire, hereby certify that I caused a true and correct copy of the foregoing Memorandum of Law in Opposition to Motion to Dismiss to be forwarded to the following on this 26th day of May, 2021 via the Court's electronic filing system.

Benjamin H. Field, Esquire
Divisional Deputy City Solicitor
Meghan Claiborne, Esquire
Deputy City Solicitor
Lydia Furst, Esquire
Deputy City Solicitor
City of Philadelphia Law Department
1515 Arch Street, 15th Floor
Philadelphia, PA 19102
*Attorneys for Defendants*

Francis Recchuiti, Esquire
319 Swede Street
Norristown, PA 19401-4801
*Attorney for Intervenor*

**BOCHETTO & LENTZ, P.C.**

*/s/ George Bochetto*

By: _____
George Bochetto, Esquire